Barbara Jean BERRY et al., Plaintiffs,

v.

SCHOOL DISTRICT OF the CITY OF BENTON HARBOR et al., Defendants.

No. C.A. 9.

United States District Court, W. D. Michigan, S. D.

May 1, 1981.

Thomas Atkins, Gen. Counsel, NAACP Sp. Contribution Fund, New York City, Duane Elston, NAACP Sp. Contribution Fund, Detroit, Mich., for plaintiffs.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., Stephen C. Small, Small & Small, Benton Harbor, Mich., for defendant Benton Harbor Schools.

E. Michael Stafford, Farhat, Burns & Story, P. C., Lansing, Mich., for Coloma Board of Ed.

Francis A. Jones, III, John L. Crow, Hartwig, Crow, Jones & Postelli, St. Joseph, Mich., for Eau Claire Board of Ed.

James E. Riley, Asst. Atty. Gen., Lansing, Mich., for State of Michigan.

Lee Boothby, Boothby, Huff & Yingst, Berrien Springs, Mich., for intervening defendants Zelma Fulner, et al.

Andrew J. Burch, Coloma, Mich., for defendant Baldwin and Concerned Parents of Hagar Township.

Thomas J. Nordberg, Thrun, Maatsch & Nordberg, P. C., Lansing, Mich., for Berrien County Intermediate School Dist.

Theodore W. Swift, Thomas A. Baird, Foster, Swift, Collins & Coey, Lansing, Mich., for intervening defendant—Michigan Ed. Assn.

Arthur G. Preston, Jr., St. Joseph, Mich., for defendant William S. Sinclair.

## DECISION AND REMEDIAL ORDERS

DOUGLAS W. HILLMAN, District Judge.

### INTRODUCTION

This is a school desegregation action involving three local school districts in Berrien County, Michigan. Berrien County is located in the southwestern corner of Michigan, bounded on the west by Lake Michigan and on the south by the Indiana border. The county's population is approximately 172,000. Twenty-five percent of that population lives in three principal cities of Benton Harbor, St. Joseph, and Niles. Benton Harbor, with a population of approximately 15,000 is the largest city.

The Benton Harbor Area School District (BHASD) is the largest school district in Berrien County with approximately 9,100 students.[1] The district presently has 77% black student enrollment. It has been the major focus of this school desegregation litigation. Coloma and Eau Claire are both predominantly white, rural school districts that abut the borders of the BHASD. Coloma School District is contiguous to BHASD directly to the north and northeast. The Eau Claire district borders the southern peninsula of the BHASD on its east border and southwest corner.

BHASD is the largest of these three school districts. It was formed in 1965 by consolidation of 16 kindergarten through eighth grade school districts, whose high school students attended the Benton Harbor High School. Subsequently, two additional K–8 districts were added to the consolidated district.

Coloma and Eau Claire are substantially smaller K–12th grade school districts with a significantly different racial makeup in their student populations. The Coloma district is the largest of these two districts with enrollment of 2,433 students, six of whom are black. The Eau Claire district has 879 students. Seventy-three of its students are black. The City of Benton Harbor lies at the far west end of the school district and is approximately 15 miles southwest of the City of Coloma and 15 miles northwest from the Township of Eau Claire.

Both Coloma and Eau Claire are small, rural, homogeneous agricultural communities with little, if any, business, social or economic interaction with Benton Harbor. These towns do not form a metropolitan area with the City of Benton Harbor. In addition to the physical distance between the City of Benton Harbor and the City of

---

1. This attendance figure for the Benton Harbor School District is taken from attendance data compiled in a district-wide pupil count taken on October 3, 1980. Coloma and Eau Claire School Districts attendance below, data is taken from a district-wide pupil count conducted on September 26, 1980.

Coloma and the Township of Eau Claire, other physical barriers exist between these communities. They are separated by wide expanses of agricultural land. In addition, an expressway from Chicago to Detroit circles the east of Benton Harbor, limiting east-west traffic in and out of the city.

It is also important to understand the population migration in and out of Benton Harbor within the past 15 years. Black students constituted 37.3% of the Benton Harbor district enrollment in 1966, 73.1% in 1976, and approximately 77% in 1981. Several factors account for this rapid change in the racial composition of the area and its school district. Movement of white population out of the city has accelerated and at the same time black movement into the city has increased. In addition, the black population presently has a birth rate that exceeds the white birth rate by 200%. These population trends are not unique to Benton Harbor, but have been characteristic of most urban centers throughout the country in the past two decades.[2] In 1968, the Whirlpool Corporation, Economic and Marketing Department, completed a demographic study of the area entitled: "Population and Mobility Trends in Benton Harbor". In this report, Whirlpool recognized this established population trend and projected that black population in the area and enrollment in the school district would continue to increase.

In addition, the City of Benton Harbor has suffered an economic disaster within the past decade. This fact cannot be ignored in assessing the segregative impact of the unconstitutional acts of these defendants. Benton Harbor presently totters on the brink of bankruptcy. The downtown business district is a blighted area. It covers 11 square blocks and in that area over 90% of the stores have been closed. Unemployment is up 700% since the 1960s. The city is hopelessly in debt, existing on a day-to-day basis and over the past several months has seriously contemplated receivorship.

I mention these facts only to demonstrate the seriousness of problems that Benton Harbor has experienced and the complexity of devising an effective desegregation remedy in an atmosphere of urban uncertainty, decay and chaos.

In spite of this gloomy overview, it is apparent that Benton Harbor still has a large number of dedicated school officials, board members and interested parents dedicated to improving the quality of the children's education.

This desegregation case has been in the federal judicial system for more than ten years. It has previously been assigned to two different federal district judges who have heard and decided the liability phase of the litigation.[3] In February, 1980, the case was reassigned to me for formulating, adopting and implementing a remedy. This

---

2. *See*, Sterlieb and Hughes, J. W., "The Changing Demography of the Central City", *Scientific American*, Volume 243, No. 2, at 448 (August 1980).

3. This school desegregation case was originally heard by Judge W. Wallace Kent. Judge Kent found that several practices of the defendant BHASD were discriminatory. However, he concluded that the racial imbalance in the Benton Harbor schools was not a result of *de jure* segregation. The Sixth Circuit affirmed in part and reversed in part, finding that a prima facie case of *de jure* segregation had been made out against the Benton Harbor School District. (505 F.2d 238 (6th Cir. 1974)). The case was remanded to the district court to provide an opportunity for the school district to rebut.

On remand, the case was reassigned to Judge Noel P. Fox. Motions by plaintiffs to add additional defendants and to enjoin transfer of a predominantly white area (Sodus II) out of the BHASD to the Eau Claire district was granted. The added defendants were the Michigan State Board of Education; John W. Porter, as Superintendent of Public Education of the Board of Education of the State of Michigan; the Berrien County Intermediate School District and the Boards of Education of the Eau Claire School District and the Coloma School District. The Sixth Circuit affirmed both the issuance of the injunction and the court's order adding additional defendants. Liability was heard and decided in two phases by Judge Fox. The first phase included findings of liability against the Benton Harbor School District, 442 F.Supp. 1280 (6th Cir. 1977). The second phase included findings of liability against the added defendants, 467 F.Supp. 630 (6th Cir. 1978).

opinion includes the court's desegregation remedy plan.

## HISTORY OF THE CASE

This action was initiated in November, 1967, by parents of black students in the Benton Harbor Area School District (BHASD) and by the National Association for the Advancement of Colored People (NAACP) against the Benton Harbor School District. In August, 1974, the plaintiffs' complaint was amended to include the Governor of the State of Michigan, the Michigan Attorney General, the Michigan State Board of Education, the State Superintendent of Public Education, (hereinafter referred to as state defendants) and the Coloma and Eau Claire School Districts as additional defendants.[4]

The facts underlying the present litigation have been fully discussed by the court in its earlier opinions. Consequently, a complete recitation of the facts need not be repeated here. The court refers the interested reader to two opinions on liability that appear at 442 F.Supp. 1280 (6 Cir., 1977) and 467 F.Supp. 630 (6 Cir., 1978) for a full understanding of the facts. In addition, see this court's opinion affirming the findings and conclusions on liability which appears at 494 F.Supp. 118 (D.C., 1980). Liability of each of these defendants has already been determined. The issue presently before the court is establishment of a constitutionally acceptable, fair, understandable and workable remedy.

The touchstone of any school desegregation remedy is that the "scope of the remedy is determined by the nature and extent of the constitutional violation." *Swann v. Charlotte-Mecklenburg Board of Education, et al*, 402 U.S. 1, at 16, 91 S.Ct. 1267, at 1276, 28 L.Ed.2d 554 (1970). Consequently, a brief review of the findings of fact made by the court on the question of liability is appropriate.

Liability was tried and findings on liability were made in two separate phases. Phase I dealt only with the conduct of the Benton Harbor Area School District. In Phase II, the court considered the conduct of the additional defendants, including the Governor of Michigan, the Attorney General of Michigan, the Superintendent of Public Instruction of Michigan, the State Board of Education, the Berrien County Intermediate School District and its Superintendent, and finally, the Coloma and Eau Claire School Districts and their superintendents.

In Phase I of this litigation, the court found that the BHASD failed to rebut a prima facie showing of *de jure* segregation established in an earlier proceeding before Judge Kent.[5] The unconstitutional, segregative conduct of the district prevaded the entire school district. The continuing purpose of the school authorities in several of their policies, was to isolate black students in certain schools and within certain classrooms while preserving the predominantly white character of other schools and classrooms. The evidence demonstrated that within the Benton Harbor District, decisions with respect to assignment of teachers, use of a "tracking" program at one junior high school, attention to conditions of school structures, provision of educational supplies, busing of students, established feeder patterns, placement of portable classrooms and temporary facilities, and inconsistent application of a neighborhood school policy were undertaken with an intent to segregate students and teachers by race. In addition, in 1973 the district acted with an unconstitutional racially-animated purpose in approving the Sodus II property transfer to the Eau Claire District, which would have had a segregative impact on the Benton Harbor district.

These actions, over a course of several years, perpetuated racial isolation and separation within the public schools. Severe and unfortunate consequences have followed from this imposed segregation. Stu-

4. All of the defendants added in August, 1974, including the state defendants and the Coloma and Eau Claire School Districts, are referred to as "added defendants".

5. *See*, 442 F.Supp. 1280 (W.D.Mich., 1977).

dents have been given and denied education opportunities based on their race. The school district has been plagued with chronic developmental and achievement problems in most of their schools. This pattern of conduct and the results that followed set the stage for the exodus of white families from the district and attempted property transfers out of the consolidated district by white property owners. Today, Benton Harbor is a predominantly black school district in chronic need of assistance. Seven of the districts' 21 elementary schools and one of its junior high schools have in excess of 98% black student enrollment.[6] Eleven of its 21 elementary schools and all three junior high schools are identified, based on fourth grade and seventh grade student performance on the most recent state-wide achievement tests, as schools with "high needs" in mathematics or reading and more frequently in both areas of achievement.[7]

In addition, the court found that the state defendants were aware as early as 1970 of racial segregation established in the Benton Harbor Public Schools. Information gained in State Board of Education hearings conducted on property transfers in 1971 and 1972 and through participation by the State Board on the "Blue Ribbon Planning Committee" in May and June of 1971 could only have added to their awareness of racially-motivated decisions and serious race related problems within the schools. In spite of this awareness, the state defendants failed to undertake any affirmative action to assist in desegregating these schools or to bring an end to race-based policy decisions within the district. By failing to act, the state defendants abandoned their statutory and constitutional roles and condoned segregative conduct within the district and assured continuing segregation and resulting loss of educational opportunities for black students. This inaction, the court found, was contrary to duties under the Michigan Constitution and laws and inconsistent with the State Board of Education's articulated policies on desegregation.[8] Failure to take steps to remedy these problems has resulted in serious developmental damage to children within the schools.

The Berrien County Intermediate School District, as well, failed to satisfy any affirmative duty to act, to discontinue race-based, segregative policy decisions within the Benton Harbor District. The Intermediate District established a "Blue Ribbon Planning Committee" in May of 1971, to address the problems of violence and declining educational achievement in the Benton Harbor Schools. Ultimately the efforts and recommendations of that committee led to the creation of the "Redistricting Planning Committee". Both committees considered redistricting proposals which would have divided the BHASD into racially-segregated subdistricts and in the end would have resulted in the abandonment and isolation of the predominantly black central city area. Under supervision of the Intermediate District, the Redistricting Committee's report included recommendations of two racially-animated and segregative redistricting plans. This report and the apparent Intermediate District support of it encouraged the hopes of white parents and property owners whose purpose was to fragment the district along racially-grouped residential lines. The Intermediate District never

---

6. Black, racially-identifiable schools within the Benton Harbor School District and their percentage of black enrollment in the 1980–81 school year are: Bard—99.7%, Boynton—99.9%, Calvin Britain—98.1%, Martin Luther King—99.2%, Morton—99.2%, Seely McCord—98%, Sterne Brunson—98.8%, and Benton Harbor Junior High School—98%. These enrollment statistics are taken from attendance data compiled in a district-wide count on October 3, 1980.

7. This achievement information is taken from the most recent scores on the Michigan Educa-

tional Assessment Program 1980–81 (MEAP), Proportions Reports.

8. On April 23, 1966, the State Board of Education and the Michigan Civil Rights Commission adopted a Joint Policy Statement on Equality of Educational Opportunity. This Joint Policy Statement was reaffirmed by the State Board of Education in 1973. The Statement is reproduced in the court's opinion in *Oliver v. Kalamazoo Board of Education*, 346 F.Supp. 766, at 776 (W.D.Mich.1973).

acted to communicate the constitutional limits to any policy decisions or conduct related to redistricting.

In addition, the Intermediate District, after a hearing held in April of 1973 on the Sodus II property transfer, voted to grant that transfer. If this transfer had been implemented, the predominantly white southern peninsula of the Benton Harbor district would have been transferred out of the district and attached to the Eau Claire School District. The property transfer was also approved by the State Board of Education, enjoined by this court and consequently never realized. The court found that the transfer would have had a segregative impact on the district and found that the Intermediate District, aware of this fact, acted with a segregative purpose in granting the petition.

Likewise, the court found that both Coloma and Eau Claire undertook to support and accomplish transfer of contiguous white residential areas from the BHASD to their own white, rural districts. Coloma participated in 1970 and 1971 in the process that led to the successful transfer of the Eamon residential area, in the northwest corner of the Benton Harbor School District. The Eamon area was transferred out of the Benton Harbor district and has been a part of the Coloma district since 1971. In 1973, Eau Claire invited annexation of the Sodus area, the southern portion of the BHASD, to its school district. The court found that both of these property transfer efforts were products of racially-inspired plans and policies within the Coloma and Eau Claire school administration.

While Eau Claire's approval of the Sodus II transfer was considerably more open than the more subtle, behind the scenes conduct of Coloma related to the Eaman transfer, both efforts were found to be racially motivated. The Eamon transfer was successful and had a segregative impact on the BHASD by withdrawing 150 white students from the district. The Sodus II transfer was enjoined by the court. However, had it been successful, it too would have withdrawn white students from the Benton Harbor School system. In addition, Eau Claire accepted tuition students from Benton Harbor, a policy designed to prevent white students from being required to attend classes with increasing numbers of black students in the Benton Harbor system.

## SCOPE OF THE REMEDY

Several alternatives are open to the court in forming a remedy for the constitutional violations that these three districts have been found to have committed. Within the plans that the court has received, several options have been recommended to it. In at least two plans, experts have recommended that these three school districts be consolidated into one in order to achieve a sufficient amount of desegregation, to create learning opportunities that will remedy the losses that students have suffered and to lay a basis for improving the quality of education for the Benton Harbor area. Three other plans recommend that the Benton Harbor district alone be totally desegregated. Under the plan submitted by Dr. Michael Stolee, Dean of the School of Education at the University of Wisconsin, Milwaukee (the court-appointed expert), the Benton Harbor schools would be desegregated and in addition, these three local districts would participate together in establishing desegregated magnet programs open to students from all three districts, and encourage voluntary interdistrict transfers. This would encourage and provide the means for voluntary desegregation.

Judge Fox, in his November 8, 1979, opinion, adopted the recommendation found in the Candoli Plan and the Foster/Green Plan, both of which called for dissolution of the three independent school districts, followed by the complete consolidation of the three districts into one and elimination of all racially identifiable schools within the newly-created district. After this school desegregation case had been reassigned to me, in an order dated June 19, 1980, I stayed the order of Judge Fox in which he mandated a three district consolidation as a necessary part of any equitable remedy in

this case. This court has since had the benefit of hearing testimony and argument offered by all parties, including Coloma and Eau Claire on the question of the "incremental segregative effect" of their segregative conduct on their neighboring school district.[9]

To begin with, I agree with several important findings discussed by Judge Fox in his analysis of the incremental segregative effect created by conduct of the Coloma and Eau Claire Districts. First, their segregative conduct had an effect on an already vulnerable school district. These effects went far beyond the removal of 150 white students from the Eamon area and 100 or more white tuition students from the Benton Harbor schools. Hopes and expectations created by the successful Eamon transfer out and attachment to Coloma contributed to a series of property transfer petitions by white property owners in 1971 and 1972. Parents began to conclude that their children's best interests would be served outside of the BHASD and believed that they could abandon the district with impunity and without responsibility for correcting behavioral and education problems plaguing the schools. Realistically, the incremental effect on racial segregation and existing educational problems cannot be quantitatively measured.[10] This court need not measure precisely the adverse effects that followed the Eamon transfer in order to conclude the results were devastating to the school district and to the quality of education it was able to offer. One school board member described the resulting chaos in the district as like "riding a moving iceberg as it fragmented beneath you."

The evidence, however, does not warrant a finding that Coloma and Eau Claire were the exclusive or major contributors to the continuing situation of racial separation and chronic low achievement in the Benton Harbor district. The system-wide effects of the constitutional violations of the Benton Harbor district itself, the State Board of Education and Superintendent of Education, and the Intermediate District all contributed to perpetuating racial isolation within the school district. I do agree with Judge Fox, however, that the practices and episodes in which Coloma and Eau Claire were involved added a significant "increment" to a situation that had a substantial segregative impact. I also agree with Judge Fox that it is unrealistic to believe that return of the Eamon area and Eau Claire's tuition students alone would give Benton Harbor back its lost stability or create educational opportunities that can remedy the losses Benton Harbor students have already suffered.

Any remedy that can be expected to work effectively and work immediately to correct the losses suffered by children in the Benton Harbor Schools must include the active participation of all three districts, based on their incremental contribution to school segregation and its related educational problems. However, an effective remedy need not compromise the autonomy of the three school districts. Under this court's plan, the boundaries of these separate and autonomous school districts will not be set aside. The remedy plan will include interdistrict cooperation in developing integrated magnet programs located in each school district

---

9. The Supreme Court has said in *Dayton Board of Education v. Brinkman*, 433 U.S. 406, at 420, 97 S.Ct. 2766, at 2775, 53 L.Ed.2d 851 (1977) (*Dayton I*), that the extent of a defendant's participation in a desegregation remedy should be determined by "how much *incremental segregative effect* these violations had on the racial distribution of the ... school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy should be designed to represent that difference ..." (Emphasis added)

10. At least two district courts have rejected the "alternative universe theory" suggested by the discussion of "incremental segregative effect" in *Dayton I. See, Booker v. Special School District No. 1, Minneapolis*, 451 F.Supp. 659 (Minn.1978), and *Armstrong v. O'Connell*, 463 F.Supp. 1295 (E.D.Wis.1979). When factors such as housing, economic and employment discrimination, as well as conduct by school administrations, result in racial changes and racial isolation within an area, it is difficult, if not impossible, to separate each factor and measure precisely the extent of the impact or present effect of any one segregative action.

and open to students from each of these districts. The court is confident that the remedial purpose of this plan can be achieved and the constitutional rights of the plaintiffs be vindicated without consolidation of these school districts.

Until the entry of final judgment disposing of this litigation, this court has the inherent power to correct any error in the findings of facts or decisions of the court in this litigation. *See, Jettro Construction, Inc. v. South Memphis Lumber Company,* 531 F.2d 348, 351 (6th Cir. 1976). Consequently, the findings of fact on the question of "incremental segregative effect" incorporated in this opinion complement and in the ultimate conclusion supercede decisions in the opinion issued by this court's predecessor in this case on November 8, 1979.

I do not disagree with Judge Fox's assessment of the seriousness of the conduct involved. Neither would I dispute his conclusion that under the principles articulated in *Milliken v. Bradley,* 418 U.S. 717, at 744–45, 94 S.Ct. 3112, at 3126–28, 41 L.Ed.2d 1069 (1974) (*Milliken I*) as applied to the facts of this case, the court has the authority to set aside the boundaries of these autonomous districts and consolidate them for remedial purposes. However, I am satisfied from the evidence that such extreme recourse is neither wise, necessary nor constitutionally mandated to achieve the remedial purposes of this plan.

Several considerations support this decision to not consolidate these three local school districts. First, the contribution of Coloma and Eau Claire to Benton Harbor's segregation and ensuing problems is significant, but is neither the exclusive nor primary cause of these problems. Secondly, the geographic structure of the area and the natural boundaries have the affect of dividing these three districts into separate, identifiable areas unrelated by any common pattern of interaction or any common governments.[11] Third, the tradition of local control over the operation of schools is deeply rooted in public education and is perceived as a unique characteristic contributing to successful public education in this country.[12] Preserving the autonomy of the districts and continuing local control of their public schools may in fact contribute to the practical success of this plan and to the quality of educational opportunities offered to students in all three districts.

Basic principles established by the Supreme Court guide this court in its responsibilities to formulate, adopt and implement a plan to remedy the conditions created by unconstitutional action and inaction of these defendants. These guiding principles are both simple and direct. The first, of course, is that principles of equity apply.

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibili-

---

11. The U.S. Supreme Court found in its opinion in *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, at 203, 93 S.Ct. 2686, at 2695, 37 L.Ed.2d 548 (1972) that a determination of state-imposed segregation and a substantial portion of a school district could support a finding of *de jure* segregation throughout the district. The Court, however, indicated that in some circumstances the physical and geographic makeup of an area might prevent a district court from applying this presumption.

"This is not to say, of course, there can never be a case in which the geographical structure of, or the natural boundaries within, a school district may have the effect of dividing the district into separate, identifiable and unrelated units. Such a determination is essentially a question of fact to be resolved by the trial court in the first instance, but such cases must be rare."

12. The importance of local control over schools and children's education was emphasized by Dr. Herbert Walburg, Professor of Urban Education and Human Development and Learning at the University of Illinois, in his testimony on the issue of achievement motivation. Local control of schools has been identified as unique to the American system of public education and a significant factor contributing to success of public education. *See also, Milliken I,* 418 U.S. at 741–742, 94 S.Ct. at 3125–3126, "No single tradition in public education is more deeply rooted than local control over the obligation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process."

ty in shaping its remedies and by facility for adjusting and reconciling public needs."

*Brown v. Board of Education*, 349 U.S. 294, at 300, 75 S.Ct. 753, at 756, 99 L.Ed. 1083 (1955).

· The Supreme Court in desegregation cases has repeatedly emphasized that:

"The task is to correct, by a balancing of the individual and collective interests, 'the condition that offends the Constitution.' A federal remedial power may be exercised 'only on the basis of a constitutional violation' and, 'as with any equity case, the nature of the violation determines the scope of the remedy.'"

*Milliken v. Bradley*, 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974), quoting *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

Once invoked, however, "the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann, supra*, at 15, 91 S.Ct. at 1275.

Application of these equitable principles requires this court to focus on three factors.

"In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. [1] at 16, 91 S.Ct. 1267 [at 1276] 28 L.Ed.2d 554. The remedy must therefore be related to 'the *condition* alleged to offend the constitution . . .' *Milliken I*, 418 U.S., at 738, 94 S.Ct. 3112 [at 3124] 41 L.Ed.2d 1069. Second, the decree must indeed be *remedial* in nature, that is, it must be designed as nearly as possible 'to restore the victims of discriminary conduct to the position they would have occupied in the absence of such conduct.' *Id.* at 746, 94 S.Ct. 3112 [at 3128] 41 L.Ed.2d 1069. Third, the federal courts in devising a remedy must take into account the interest of state and local authorities in managing their own affairs, consistent with the Constitution."

*Milliken v. Bradley*, 433 U.S. 267, at 280–281, 97 S.Ct. 2749, at 2757–2758, 53 L.Ed.2d 745 (1976) (*Milliken II*).

A three district remedy designed to achieve an established degree of racial balance in each school in these three local districts would be remarkedly sweeping. In my opinion, the scope of such a remedy sweeps too broadly. Such a far reaching remedy imputes to school officials in Coloma and Eau Claire an intent far more pervasive than the evidence justifies.

In *Milliken I, supra*, 418 U.S. at 744–745, 94 S.Ct. at 3126–3128, the court described the nature and extent of constitutional violations that would warrant consolidation of separate school districts or imposition of an interdistrict plan for remedial purposes. The court said:

"Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts' racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy."

Interdistrict violations with interdistrict effects of sufficient seriousness have been established in this record on liability to warrant interdistrict involvement in a remedy under this test. The actions of Coloma and

Eau Claire not only contributed to segregation, they also contributed to disruption within the Benton Harbor District which rendered school officials unable to solve the racial and educational problems facing the district. Coloma's contribution to these problems, if measurable and if measured, would certainly be perceived as being greater than any incremental contribution made by Eau Claire school officials. The effect of any racially inspired conduct on the part of Eau Claire by school officials is diminished by the fact that the Sodus II property transfer was never completed. The successful Eamon transfer had a much more grave effect on the events that followed it than the aborted Sodus II transfer. This disparity in incremental contributions, however, exists not because of any different degree of racially inspired conduct in the two school districts, but because the Sodus II transfer was enjoined by this court.

Both districts participated in racially motivated planning that in one instance did and in the other would have, created opportunities for white property owners and students to abandoned the fragmenting iceberg. Violations by both school districts have had a clear, interdistrict effect. These constitutional wrongs call for an interdistrict remedy, but something less than consolidation of these three districts and less than complete desegregation in each district.

The extent of this three district remedy is appropriately limited by other factors that the court must consider, including the crucial importance of local control over public education. Local control has been identified as unique to American education and essential to continuing community contribution to the quality of education. Continued local control of Coloma and Eau Claire School will not only enhance the quality of educational opportunities for their students, but will also inure to the benefit of Benton Harbor students who participate in distinctive magnet programs established in this plan.

In *Milliken I, supra,* in discussing circumstances under which a federal court may order desegregation that includes more than one school district, the court cautioned against treating school boundaries as "no more than arbitrary lines on a map drawn for 'political convenience'". The court said:

"Boundary lines may be bridged where there has been a constitutional violation calling for interdistrict relief, but the notion that school district lines may be casually ignored or treated as a mere administrative convenience is contrary to the history of public education in our country. No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process. See *Wright v. Council of the City of Emporia,* 407 U.S. 451, at 469 [92 S.Ct. 2196 at 2206, 33 L.Ed.2d 51]. Thus, in *San Antonio School District v. Rodriguez,* 411 U.S. 1, 50 [93 S.Ct. 1278, 1305, 36 L.Ed.2d 16] (1973), we observed that local control over the educational process affords citizens an opportunity to participate in decisionmaking, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence.'"

418 U.S. at 741–742, 94 S.Ct. at 3125–3126.

The condition that offends the Constitution here can be corrected without sacrificing the autonomy of Coloma and Eau Claire districts. In fact, the collective interests of all three districts may well be best served by the continued existence of these districts. The success of this plan turns on the resolve and the ability of these three districts to work cooperatively in creating opportunities for quality, integrated education for their students.

The court cannot be blind to the potential disruption of the entire educational process by an order overly broad, not warranted by the evidence, which in effect would destroy the existence of three lawfully-constituted school districts. I am satisfied that the

great majority of black and white parents and children have no objection to integrated schools as such. All parents object strenuously, however, to a system that appears to use children as pawns to bring about desirable social and economic goals that adults have as yet failed to achieve; such as fair and equal housing, freedom of mobility, and equal employment opportunities. One need not be told by experts to know that our children's future economic success, happy, useful and worthwhile lives depend to a large degree on the quality of their education. Parents, black and white, unquestionably place achievement of their children in academically acceptable schools as their top educational priority. It is my hope and expectation that the court's plan will accomplish just that in a safe, harmonious, cooperative desegregated environment.

Two goals must be achieved to make the court's plan a success: (1) greater numbers of children in Benton Harbor must be educated in desegregated school environments; (2) Benton Harbor children must be provided with increased opportunities for quality educational experiences with professional and compassionate assistance to enable them to improve their achievement motivation and task performance. The Benton Harbor, Coloma, and Eau Claire School Districts, the Berrien Intermediate School District, and the State Board of Education have each been sufficiently implicated in contributing to segregation and resulting developmental problems, that each entity must contribute actively to this court's conceived remedy plan.

## THE COURT'S DESEGREGATION PLAN

### Introduction

In February, 1980, this case was reassigned to me for formulating, adopting and implementing a remedy. Motions for reconsideration of the liability were filed by all of the added defendants and denied. In an opinion dated June 19, 1980, the court reaffirmed the findings and conclusions on liability as determined by Judge Fox. The court has since heard at least 27 days of testimony, including testimony of 9 expert witnesses, and has had the benefit of the parties' briefs and proposed findings of fact and conclusions of law on the question of an appropriate remedy. In addition, five different plans proposed to remedy the unconstitutional conduct of the defendants have been submitted to the court and have been the subject of testimony as well.

This opinion includes the court's desegregation remedy plan in which all defendants are directed and expected to participate cooperatively. The extent of involvement of each defendant is based on the nature and extent of its unconstitutional conduct and its adverse, segregative impact on the Benton Harbor School District. The court is of course guided in fulfilling its duties and limited in the exercise of its power to impose a remedy on any defendant by the mandate that the scope of the remedy not exceed the scope of the constitutional violation. *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Austin Independent School District v. United States*, 429 U.S. 990, 991, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976) (Powell, J. concurring); *Pasedena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

The court has made every effort to remain faithful to this objective. In addition, the court is aware that the Supreme Court has directed district courts in school desegregation cases to determine how much "incremental segregative effect" each constitutional violation has had on the racial distribution of the school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy then must be designed to redress that difference in racial distribution. *See, Dayton Board of Education v. Brinkman*, 433 U.S. 406, at 420, 97 S.Ct. 2766, at 2775 (1977) (*Dayton I*). It is apparent, however, that precise measurement of the

incremental contribution of each defendant to segregation and its resulting problems in the Benton Harbor schools is impossible. However, the extent of involvement of each defendant in the remedy has been tailored, as closely as possible, to the extent of the impact of their unconstitutional conduct on the Benton Harbor School District.

This is an equitable remedy. Therefore, it follows no hard and fast established rules. Of necessity it is a product of judicial judgment. It is a plan that has emerged after careful and thoughtful analysis of the evidence. It is intended to be practical and fair. It is not intended to be punitive. It is conceived as a plan designed to work effectively and immediately to correct an unfortunate situation caused and contributed to by conduct in violation of the Fourteenth Amendment.

This plan has not been developed in isolation from the greater ongoing debates about educational benefits of court imposed school desegregation. The court is, of course, aware that scholars, members of Congress, and members of the Supreme Court have engaged in public policy debates on the subject of court imposed school desegregation.[13] Many people question the proper limits of the role of the federal courts in confronting problems of public education. Criticism has been leveled at judicial approaches to desegregation which in many instances relied heavily on use of court imposed student transportation and establishment of precise racial balance in schools.

The plan, hereinafter detailed, uses transportation of students as a limited and necessary tool to achieve racial desegregation. The plan does not, however, rely exclusively on imposed racial balance in schools or on extensive transportation of children. In my judgment, those techniques alone will not solve the educational problems related to imposed racial separation and isolation in these three school districts. To some, the plan may be seen as going too far; to others not going far enough. It utilizes traditional desegregation techniques and some unique educational interventions as well. Very simply, it is designed to achieve two critical objectives: to enhance desegregation within the three local school districts and to improve academic achievement within the Benton Harbor schools without impairing the high standards already established in Coloma and Eau Claire. First, it creates opportunities for quality education in an integrated environment in each of these three local school districts. In some instances, use of that opportunity depends on the interest and initiative of students and parents. Secondly, it includes introduction of innovative educational programs designed to improve achievement motivation and performance within the Benton Harbor schools.

It is well established that successful public education depends to a large extent on family and community support for its effectiveness. When substantial elements of the community abandon their schools their quality diminishes. It is equally obvious that a child's enrollment is not determined by government policy or judicial order alone. It is as much determined by parental decision. If parents perceive court imposed educational desegregation as unfair or inequitable overreaching by the court, they will do all in their power to oppose it. Likewise, parents under such circumstances frequently resort to withdrawing their children from schools out of fear or resentment or a combination of both feelings.

These practical considerations have not traditionally played a role in the judicial

**13.** Academic debate has intensified about the question of the extent of educational benefits realized by children as a result of integrated education. Researchers and writers find it difficult to agree on the effect of desegregation on black student achievement. *See*, Coleman, "New Incentives for Desegregation", 7 *Human Rights*, No. 3, at 10 (1978), Crane, R. and Mahard, R. "Desegregation and Black Achieve-ment: A Review of the Research", 42 *Law and Contemporary Problems*, No. 3, at 17 (1978). *See also*, Justice Powell's dissenting opinions in *Austin Independent School District v. United States*, 429 U.S. 990, at 991, 97 S.Ct. 517, at 517, 50 L.Ed.2d 603 (1976); and *Columbus Board of Education v. Pennick*, 443 U.S. 449, at 479, 99 S.Ct. 2941, at 2987, 61 L.Ed.2d 666.

task of formulating and adopting a desegregation remedy plan. However, they cannot be ignored by this court. The goal of creating desegregated educational environments, if they are to be lasting and conducive to quality education, must have the support of parents. Recognized studies indicate that parental support is the single, most important factor in contributing to children's scholastic achievement.[14]

To achieve desegregation and quality education, the school districts, the Intermediate School District, and the State Board of Education are directed to develop attractive incentives to interdistrict transfers that will expand minority enrollment in Coloma and Eau Claire and enhance desegregation in all three districts. Distinctive and imaginative magnet educational programs will be used at all grade levels throughout the three districts as a primary incentive to interdistrict transfer.

In addition, joint three district wide community and parent involvement is encouraged in several particular components of the plan. The court has directed that a committee of educators, students, parents, and interested community members be established to review existing discipline codes in the three districts. This committee is directed to develop a uniform code of conduct and discipline. It is the court's opinion that clear and unambiguous statements of conduct expected and limits on behavior, as well as procedures for uniform discipline, is crucial to the students' perception of fairness in the schools and ultimately to the success of interdistrict aspects of this plan. Within the Benton Harbor district, parent participation in school classrooms and extracurricular activity will be encouraged as a productive and necessary part of the achievement component of the plan. Finally, the court has established a Community Education Council made up of parents and concerned community members who are genuinely willing to support the desegregation effort that these schools are about to embark upon. The court seeks individuals willing to abandon fears and prejudices, willing to accept school desegregation and determined to make this plan for these districts a success. This group will play several roles including acting as liaisons from the community to the school boards and liaisons to the court reporting both successes and problems in implementation of the plan.

Parents and members of the three communities will be invited to attend public meetings where the components of the plan will be explained by persons who are familiar with its details. These opportunities for parent and community involvement will enable and encourage broad-based understanding of the processes and purposes of the court's plan. Communication among all elements of the community is crucial to success of this plan. The plan will be widely explained to the end that people who understand it will support the school districts in their efforts to implement it.

An innovative and unique component of the plan is an achievement and social skills intervention to be implemented within the Benton Harbor school system. I realize fully that federal courts are not equipped with any particular competence in developing educational policies or long-term solutions to educational problems. However, my decision to outline in some detail the process of intervention in this area has been made deliberately. It is a decision necessitated by the existence of chronic achievement problems that the school district itself has been unable to address.[15]

14. The importance of the role of the parent in stimulating achievement was emphasized by Dr. Walberg in his testimony on the factors that contribute to achievement stimulation and achievement lag. There has been found a high correlation between the extent of emotional support from parents, parental interest in children's schoolwork, parental intellectual stimulation of children and a child's achievement and motivation.

15. The performance of fourth grade students on 1980 Michigan Statewide Achievement Tests indicate that at least 11 of the 21 elementary schools have "high needs" for improvement in achievement motivation and cognitive skills. Three of these 21 elementary schools have only kindergarten through third grade classes. No fourth grade achievement tests were given in those schools. All three junior high schools are identified as schools with

This plan includes program components designed to generate community support, alter organizational features in schools involved, promote classroom innovations and enable individuals within the schools to change and adapt to racial changes in the schools and in their larger society. All of the components recommended in this plan have been features in at least one school system's desegregation plan or in one instance, in an inner-city achievement motivation project. Finally, each component offers considerable promise for helping to achieve desegregated education that benefits the students involved. In the end, the success of this effort depends on the resourcefulness and cooperation of persons within each of these three districts, in accepting desegregation and working cooperatively to everyone's mutual benefit. If the communities and school districts are able to work cooperatively in implementing each component of the plan, the plan promises to work effectively and to work now.

## INJUNCTION OF PROPERTY TRANSFERS AND TUITION STUDENTS

The Eamon residential area which lies to the northwest of the Benton Harbor School District and has been part of the Coloma School District for the past ten years shall be transferred back to the Benton Harbor district. The small, four-room Eamon elementary school shall be returned to the Benton Harbor district as well. There will be no financial liability on the Benton Harbor district for purchase of this building. In addition, the defendant school boards and the State Board of Education are permanently enjoined and prohibited from initiating, encouraging, approving or granting a request for transfer of the Eamon area to the Coloma School District, or to any other school district.

Similarly, transfer of the Sodus II area, or any area of the Benton Harbor School District which includes any part of the Sodus II territory, is permanently enjoined.

The defendants are enjoined and prohibited from initiating, encouraging, approving or granting a request for transfer of the Sodus II area out of the Benton Harbor School District to the Eau Claire School District or any other neighboring school district. In addition, the Eau Claire School District is permanently enjoined from receiving tuition students from the BHASD, except under the terms and conditions included in the interdistrict transfer aspects of this court's desegregation plan.

## PUPIL REASSIGNMENT

A complete desegregation plan must be implemented within the Benton Harbor school system. The court is not directing that the school district adopt and implement the court's recommended student reassignment plan. The court is, however, directing that the district adopt a student reassignment plan that will eliminate racial identifiability of schools and achieve desegregation within all schools in the district. Any plan to be acceptable to the court must achieve the same, or a greater degree of desegregation as that achieved in the court's plan. In addition, the court recommends that the school district place a high priority on using a uniform grade structure which allows children in grades one through four to remain in the same school building. The school district should make every effort to use minimal additional transportation, without compromising the purpose of achieving desegregation.

Planning for student reassignment and transportation under an acceptable district-wide desegregation plan should be made the first priority of the Benton Harbor School District. Plans for student reassignment within the Benton Harbor district should be made by a staff team appointed by the superintendent, acting under the supervision and with the assistance of the court's representative. Their task should be completed and a plan for student reassignment adopted by the district by no later than

"high needs", based on the most recent seventh grade performance on achievement tests. There is a high correlation between low achievement and racially-identifiable black schools.

May 12, 1981. The adopted plan must not be based on "phased/in" desegregation. It must be fully put in place on the opening day of school in the 1981–82 school year.

Fundamentally, any effective desegregation plan must desegregate the schools and eliminate racial identifiability of schools. Once faculty reassignment has been accomplished, and the marks of a school's racial identification have been corrected, the racial composition of the student body remains as a critical identifying characteristic of the school.

Having found a history of segregative practices in the Benton Harbor district followed by a default within that district it is within the equitable powers of this court to use racial ratios as a starting point in formulating the remedy plan. *See, Swann, supra,* 402 U.S. at 24, 91 S.Ct. at 1280. Benton Harbor's school population of 9,100 is approximately 77% black, 22% white and 1% other minorities. Seven of its 21 elementary schools and one of its three junior high schools are racially identifiable as black schools. Each of these schools has a black student population that represent 98% or more of the school's total enrollment.[16] At least three schools are identifiable as white schools by their pupil population alone.[17] The school district has not sustained its burden of showing, in the face of district-wide segregative practices, that any of these school assignments were genuinely non-discriminatory. Consequently, the racial identifiability of these schools must be eliminated as a part of this plan.

No fixed or undeviating degree of racial proportions of pupils in each school is required. The court has attempted to build in some flexibility in the use of racial ratios without compromising the purpose of achieving desegregation. However, the racial composition of the district as a whole provides a reference for determining what are or are not racially identifiable schools within the school system. A racially identifiable school is one that is substantially disproportionate in its racial composition when compared to the composition of the school district as a whole. *Swann, supra,* at 26, 91 S.Ct. at 1281.

Racial identifiability of schools must be eliminated as part of this plan in order to create an educational atmosphere where both blacks and whites are perceived as equal. This school district should strive to become a place where children, regardless of their race, are perceived and treated as equal in their status and in their ability to achieve. One-race schools are likely to be perceived by members of the black community as an affront. Racially identifiable schools perpetuate feelings of inferiority in one race and a perception among both blacks and whites that they are not, in fact, equals in the endeavors of public education.[18] These schools act as reminders of past segregative practices within the district. In addition, minority students assigned to identifiably black schools are cut off from the majority culture which is widely reflected in standards both explicit and implicit, that determine success in our society. An individual may choose to separate himself or herself from the majority culture, but that separation should be chosen and not imposed by the public schools.

Inevitably the court's primary concern with desegregation conflicts with other legitimate concerns. The court has attempted to accommodate other important educational interests without compromising the principal purpose of achieving desegregation.

The court's recommended plan uses pairings and clusterings of elementary schools

---

16. See footnote 6, *supra.*

17. Schools that are racially identifiable as white schools within the Benton Harbor School District followed by the percentage of their white student population are: Martindale—71.9%, Millberg—96.9%, and Pearl—65.4%.

18. The Supreme Court long ago in *Brown v. Board of Education,* 347 U.S. 483, at 494, 74 S.Ct. 686, at 691, 98 L.Ed. 873 (1955) (*Brown I*), identified the existence of one race schools and the exclusionary practices that create them as generating within black children "a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely to ever be undone."

in order to eliminate racial identifiability of schools. Inner-city, predominantly black schools have been paired with schools that presently have larger white student populations, to create eight elementary attendance areas. Student reassignments are to be made by the school district within each pair or cluster to achieve desegregation in each school building and each classroom. The court recommends that three predominantly white elementary schools be closed and their students reassigned to achieve desegregation.

Feeder patterns to the junior high schools are adjusted to achieve better desegregation. The minority population in the predominantly black inner-city Benton Harbor Junior High School (presently 98% black student body) is reduced to 78.6% of that school's enrollment. In addition, it is recommended that the district discontinue the use of space within the Hull elementary building for seventh and eighth grade classes.

There is one senior high school in the district. Consequently, all students within the system will attend the Benton Harbor High School.

The pairs and clusters in this plan have been drawn in such a way to minimize required transportation. However, given the location and capacities of existing school buildings and the racial concentrations of its population, it is impossible to achieve any meaningful desegregation of this school district without some mandatory transportation of its pupils. It should be remembered that transportation by bus has been commonly used within this school district since consolidation in 1965. It is not new to the district, nor is it a new experience for many of these children.

Attendance assignment in pairs and clusters allows people who come together in early elementary school, to remain together through their elementary and secondary education in the system. Opportunities for children to establish and maintain stable peer relationships is important to their personal development and to development of racial understanding. In order for children of different races to achieve mutual understanding and respect for one another, they must be brought together and allowed to continue to have contact with each other over a period of years, regardless of their residential neighborhood. Under this pairing and clustering plan, children who are brought together for grades one through four can expect to be assigned together to a second elementary school for grades five and six, to the same junior high school and finally to senior high school. Achieving this planned continuity will, of course, depend on whether the child and his family remains in the original, first grade neighborhood. While consistent continuity for each child cannot realistically be expected, it is nonetheless important to create the opportunity for children to develop and maintain stable peer relationships. This assignment plan will achieve that important purpose for at least some of these children.

With the elimination of the use of space in Hull elementary school for seventh and eighth grade classes, junior high feeder patterns have been established to maintain a neighborhood pattern in junior high attendance as well. The district is divided into two junior high school attendance areas along an east-west access. Children from the northern half of the district attend the Benton Harbor Junior High School and those in the southern section of the district attend the Fairplain Junior High School.

Elimination of racial identifiability of schools can most simply and consistently be achieved by the school district by using a guideline based on the racial composition of the district as a whole. The court expects the school district to use the following guidelines for pupil reassignment in this or any other desegregation plan that it may adopt. The recommended limits on variation and racial population in each school is based on the percentage of black representation in the student population of the district as a whole. A constant increment of

ten percent is used to define variation limits of racial composition in each school.

In the Benton Harbor district, based on the October, 1980, student attendance count, black students at all grade levels represented 77% of the total school's population. Thus, recommended limits for the percentage of black student population in each school building should be 67% to 87%. Under the court's recommended plan, most elementary schools would have black pupil attendance within a five percent deviation from the racial composition of the school district as a whole. The court emphasizes that this guideline for racial composition in each school is simply that, a guideline. The school district should keep this degree of racial mixing as its goal in any plan that it adopts. It is, however, not an inflexible, undeviating rule that must be applied in every instance. Exceptional circumstances occasionally can justify exceptions to pursuant of this goal. However, the goal remains.

Three elementary schools under the court's recommended plan have black populations that fall below the court recommended variation. These are Fairplain East with a 64.7% black population, Hull School with a 60.3% black population and Stump-Nickerson School with a 44.1% black population.

The continued disproportionately low percentages of black student population in both Hull and Stump-Nickerson schools are acceptable because they result from an effort to accommodate other legitimate educational needs. It was difficult, if not impossible, to establish a uniform grade structure throughout the school district, given the location and capacity of existing school buildings without making some compromise in the degree of desegregation introduced into both of these schools. In my judgment, keeping students together through grades one through four in one school building for these crucial, early elementary years is important to their development and to activities and innovations expected to be introduced in the achievement component of the court's plan. I have recommended increasing the student-teacher contact in grades one through four to two years. Under the court's plan, this can be achieved. A uniform grade structure is used within the elementary schools in each pair and cluster with the exception of the Stump/Nickerson attendance area. In addition, the Stump/Nickerson school has a special education program and a facility designed for physically handicapped students. The court has avoided any disruption of this educational plan. These deviations from the court's established desegregation goals are legitimately warranted by these educational concerns.

*Elementary Pairs and Clusters.*

Table 1 shows how the elementary schools are paired and clustered under the court's plan to eliminate racial identifiability of schools within the school system. To accomplish this desegregation, eight attendance areas are created, including groups of two, three and four schools. Groupings of two or more schools in one attendance area are commonly referred to as a "cluster". Two 2-school pairings are made, three clusters of three schools, one cluster of four schools, and finally, two schools, Fairplain Northeast and Stump/Nickerson are left to continue with their existing attendance area. Fairplain Northeast has a 74.1% black population which approximates the racial composition of the district and indicates the presence of an integrated neighborhood. The Stump/Nickerson school has a low black population (44.1%). However, it has been left intact to accommodate other educational needs. It has not been included in any pair or cluster under the desegregation plan to avoid disruption to students in its special education program.

Student reassignment to achieve acceptable racial proportions in each school will be done within each attendance area. For example, in attendance area number I, any student who lives within the present at-

tendance areas for Morton, Northshore, Lafayette, or Eamon schools knows that he or she will attend first grade through fourth grade in the Morton school. These same students will attend fifth and sixth grade in either Northshore or Lafayette schools. No student in cluster number I will be assigned to a school outside of that cluster to achieve desegregation within the school district.

Under the plan, kindergarten classes are held in some fifth and sixth grade school buildings. This is done to avoid disruption to kindergarteners in the first year of school desegregation. Within the second and third year, under the adopted desegregation plan, kindergarten classes should all be moved into kindergarten through fourth grade school buildings.

### TABLE I

Benton Harbor

Proposed Student Assignments

Elementary Grades

| Pair/Cluster | Capacity | Grades | Black | Non-Black | Total | % Black |
|---|---|---|---|---|---|---|
| **I.** | | | | | | |
| Morton | 505 | SP, K-4 | 320 | 101 | 421 | 76.1 |
| Northshore | 150 | K, 5-6 | 97 | 38 | 135 | 71.9 |
| Lafayette | 190 | SP, 5-6 | 72 | 23 | 95 | 75.8 |
| Eamon* | 100 | CLOSE | | | | |
| **II.** | | | | | | |
| Bard | 575 | SP, K, 5-6 | 177 | 64 | 241 | 73.4 |
| Hull | 725 | SP, K-4 | 310 | 204 | 514 | 60.3 |
| Martindale | 240 | CLOSE | | | | |
| **III.** | | | | | | |
| Johnson | 225 | SP, 5-6 | 128 | 46 | 174 | 73.6 |
| Millberg | 200 | CLOSE | | | | |
| McCord | 615 | SP, K-4 | 418 | 126 | 544 | 76.8 |
| **IV.** | | | | | | |
| Boynton | 470 | K-4 | 249 | 83 | 332 | 75.0 |
| Pearl | 150 | 5 & 6 | 115 | 36 | 151 | 76.2 |
| **V.** | | | | | | |
| Brunson | 590 | K-4 | 397 | 147 | 544 | 73.0 |
| Fairplain East | 390 | K, 5-6 | 187 | 102 | 289 | 64.7 |
| Sorter | 440 | K-4 | 298 | 111 | 409 | 72.9 |

| Pair/Cluster | Capacity | Grades | Black | Non-Black | Total | % Black |
|---|---|---|---|---|---|---|
| **VI.** | | | | | | |
| Stump-Nickerson | 200 | SP, K-3 | 37 | 47 | 84 | 44.1 |
| **VII.** | | | | | | |
| Fairplain NE | 275 | K-6 | 180 | 63 | 243 | 74.1 |
| **VIII.** | | | | | | |
| King | 440 | SP, K-4 | 291 | 44 | 335 | 87.0 |
| Britain | 495 | 1-4 | 301 | 53 | 354 | 85.0 |
| Fairplain West | 335 | SP, 5-6 | 181 | 45 | 226 | 80.1 |
| Fairplain NW | 200 | 5 & 6 | 160 | 36 | 196 | 81.6 |
| TOTALS | | | 3,918 | 1,369 ** | 5,287 ** | 74.1 |

* 1980/81 enrollment estimated to be 69 non-black, 0 black

** Includes 69 students currently assigned to Eamon in the Coloma School District

These eight attendance areas are depicted graphically on a map of the Benton Harbor School District included in Appendix B at the conclusion of this opinion.

The principals of elementary schools within each cluster shall form a Principal Cluster Council. These councils shall meet monthly, in the first semester under the desegregation plan. Thereafter, they shall meet at least quarterly through the school year. The purpose in establishing Principal Cluster Councils is to provide opportunities for meaningful dialogue on problems related to desegregation.

*Junior High Feeder Patterns.*

Student assignment to junior high schools under the plan are shown on Table 2. Use of the Hull Elementary School facility for grades seven and eight is discontinued. Students who would normally attend Hull school for junior high school under existing attendance plans are reassigned to the Benton Harbor Junior High School. Each elementary pair or cluster is assigned as a unit to one of the remaining junior high schools, with the exception of the King/Britain/Fairplain West/Fairplain Northwest cluster. When these students reach junior high school age, children attending King and Britain schools will go to the Benton Harbor Junior High School. Fairplain West and Fairplain Northwest students will attend Fairplain Junior High School. Benton Harbor Junior High School will have an estimated 78.6% black student population and Fairplain junior high school a 68.8% black student population.

TABLE II

Benton Harbor

Proposed Student Assignments

Junior High School

| School | Capacity | Grades | Black | Non-Black | Total | % Black |
|--------|----------|--------|-------|-----------|-------|---------|
| Feeder | | | | | | |
| Benton Harbor Jr.* | 875 | 7-8 | 569 | 155 | 724 | 78.6 |
|   Bard | | | | | | |
|   Britain | | | | | | |
|   Bull | | | | | | |
|   Johnson | | | | | | |
|   King | | | | | | |
|   Lafayette | | | | | | |
|   McCord | | | | | | |
|   Morton | | | | | | |
|   Northshore | | | | | | |
| Fairplain Jr. High* | 640 | 7-8 | 426 | 193 | 619 | 68.8 |
|   Baynton | | | | | | |
|   Brunson | | | | | | |
|   Fairplain East | | | | | | |
|   Fairplain Northeast | | | | | | |
|   Fairplain Northwest | | | | | | |
|   Fairplain West | | | | | | |
|   Pearl | | | | | | |
|   Sorter | | | | | | |
|   Stump/Nickerson | | | | | | |

* Junior High population projected on a factor of 25.4% of elementary population

These junior high school feeder patterns are depicted graphically on a map of the school district included in Appendix C at the conclusion of the court's opinion.

*School Closings.*

The court recommends that the school board close three elementary schools under the court's plan. In the 1980–81 school year, the school districts closed three elementary schools: Columbus, Sodus and Spinks Corner. Columbus was an inner-city school with an 84-year-old structure. Sodus and Spinks Corner were both small, rural schools at the periphery of the district that had suffered significant reduction in student enrollment in the 1970s and were operating at less than half of their full capacities at the time they were closed. Sodus was a three-room school in the farthest southern portion of the school district with approximately 30 students attending it. Spinks Corner was a one-room school on the far east end of the school district, with only 28 students attending it.

The court recommends closing of three additional schools. They are: Eamon, Millburg, and Martindale. Each one of these schools is racially identifiable as a white school, based on their student enrollment and faculty composition.[19] If these schools are closed, students from their attendance area can be reassigned in such a way to enhance the objectives of school desegregation.

Each of these three schools has a fairly limited capacity. Eamon is a small, four-room school on the farthest north end of the district, with a 100-student capacity. Since its transfer out of the district in 1972, it has been part of the Coloma School District. It has a 100% white student population. Millburg School is a 56-year-old school building in the northeast corner of the district. It has a capacity of 200 students, but is presently operating with an enrollment of approximately 80 students. Black children make up 3.1% of its student population. Martindale School is also a rural school, directly southeast of the Eamon School. Its capacity is 240 and it has been operating with an enrollment of approximately 195 students. Its black student population represents 28.1% of its total enrollment. Closing of these schools would be both cost effective, in reducing operating costs and serve the purposes of the court's desegregation plan.

*Transportation.*

The plan calls for transportation of approximately 2,500 students. The school district presently owns 32 buses. These vehicles can be used to transport students for the purpose of achieving desegregation. If the opening hour of elementary schools can be adjusted so that it is different from the high school opening time, some buses can be used for two pick-up and delivery runs each day. The pupil reassignment committee should explore the possibility of using an adjusted opening hour for elementary schools to make possible efficient use of the districts existing bus fleet. If adjusted opening hours for elementary schools can-

not be used, pupil reassignment under this plan can be accomplished with the purchase of not more than eleven, 65-passenger buses.

Dr. Franklin H. Westervelt, Professor of Engineering and Computer Sciences and Director of the Computer Service Center at Wayne State University, has been appointed as the court's transportation expert. He will be available to the Benton Harbor School District to assist it in planning a transportation schedule that makes efficient use of the district's existing fleet of buses and minimizes the need to purchase additional buses.

If additional buses are needed to accomplish transportation under this school district's desegregation plan, the district shall promptly inform the court of the number of additional buses needed to be purchased and explain the reasons why the plan cannot be accomplished with existing buses, presently owned by the district.

## MAGNET PROGRAMS AND INTER–DISTRICT TRANSFERS

The court has found that the State Board of Education, the Berrien County Intermediate School District, and the Coloma and Eau Claire School Districts have each contributed to racial isolation of students in the BHASD and to the problems related to racial separation and isolation experience in that school system. These districts are obligated then to participate in a remedy that creates quality educational opportunities for their own students and Benton Harbor students in an integrated school environment.

A plan should be developed that includes a number of distinctive magnet programs designed to attract students from throughout the three school district area. These attractive educational programs should include opportunities for students at all grade levels from kindergarten through twelfth grade. The plan should advance the positive goal of improving the quality of educa-

19. The Eamon Schools student population is 100% white, Millburg has a 3.1% black student population and Martindale a 28.1% black student population.

tion available to all children in the Benton Harbor, Coloma and Eau Claire schools, whatever their race or ethnic origin. The quality of the education experience available to students in these programs should be such that the plan will motivate and encourage voluntary transfer of students between Benton Harbor and Coloma and Benton Harbor and Eau Claire, in such a way that all three districts will be further desegregated.

Dean Michael J. Stolee, the court-appointed desegregation and education expert, has recommended that a committee be made up of the superintendents of the BCISD, the BHASD, Coloma and Eau Claire School Districts and a representative of the State Board of Education to begin planning immediately for implementation of wide-ranging programs that will facilitate voluntary pupil transfers between the three districts. I am directing that such a committee made up of these members be constituted immediately to plan and prepare programs, to the extent feasible, for the 1981 fall semester. The process of planning is undoubtedly complex and will continue into the new school year with the expectation that these programs will be expanded in the 1982-83 and 1983-84 school years.

It is impossible to predict to what extent planning will be completed and readiness will be achieved for implementation by the fall of this year. The court does not expect achievement of unrealistic or unattainable goals within a limited time. However, minimally, a three-district vocational, technical and work-study program in cooperation with local businesses and industry should be established in the BHASD. Coloma and Eau Claire school districts are both directed to discontinue any existing interdistrict vocational educational programs with other school districts in order to enhance the success of the cooperative effort in vocational education with the BHASD. These three districts shall work together to solicit participation of area businesses and industry in a joint work-study program for the benefit of the high school students in the three districts.

The school districts are directed to employ teachers and administrators that are reasonably necessary to work on this joint planning process during the summer months. In addition, the State Board of Education shall contribute personnel to assist in planning and in the fall implementation of this component of the plan. The first task to be undertaken by this committee shall be the conducting of a needs assessment in the three school districts. This effort should identify the educational program needs and gaps in existing educational programs based on information from students, parents, educators and other residents. The committee should become familiar with magnet education programs used to compliment or motivate desegregation in other school districts such as Boston, Massachusetts; Dallas, Texas; Cincinnati, Ohio; and Milwaukee, Wisconsin. The committee shall explore the use of enriched educational programs in the arts, sciences and foreign languages at the elementary and secondary levels in this component of the plan. At the elementary level, the committee shall explore the use of the Montessori learning system in one or more elementary schools situated geographically to attract an inter-racial student population from more than one district.

Ultimately, the task of the Magnet Programs Committee is to develop quality, cooperative educational programs that will be attractive to students and their parents and to locate them throughout the three districts in such a way that black Benton Harbor students will voluntarily attend schools in Coloma and Eau Claire, and white students from the outlying, rural districts will likewise be motivated to attend schools in the Benton Harbor district.

It is the court's expectation that 10% to 25% of the students attending magnet programs will be interdistrict transfer students, who by their race contribute to decreasing racial isolation in each school system. Seventy-five per cent of positions in any magnet program should be open to students within the school district where the program is located.

The school boards jointly shall have the authority to employ consultants to assist and advise the Committee in the development, implementation, evaluation and continuing improvement of these distinctive education programs for the next two school years.

The committee shall establish and recommend to the school boards an annual calendar and daily opening and closing times for schools for the purpose of facilitating transfer of students among the three school districts. The court-appointed transportation expert shall make himself available to the committee to establish workable transportation arrangements for students attending schools in a district other than their residential district. Members of the committee should discuss and resolve questions such as scope of authority over programs, personnel and resources used in these distinctive magnet programs, division of responsibility and handling of financing and make recommendations on these issues to the school boards of each district. Joint school board decisions shall be reached on these issues. The court is concerned that education programs used in this component of the plan be perceived by the students, parents, teachers, and administrators as joint three-district-wide programs. To accomplish that end, some joint governing of these programs must be established, perhaps in the form of a joint committee with representation from each school board. The committee should recommend to the school boards an appropriate structure for joint governing of these magnet programs, that will include the involvement of all three districts in assuring the vitality and quality of these educational programs.

Decisions about the content and location of distinctive and attractive magnet programs to be included in the 1981–82 school year should be completed by July 1, 1981. A report including information on these magnet programs and any planning completed for the 1982–83 school year shall be submitted to the court, to the three school boards, the Intermediate School Board and the Community Education Council by July 1, 1981. Proposed literature explaining magnet programs and the process for electing participation in interdistrict programs should be included in this report and submitted to the three local school boards for their approval. The school boards should complete their review and comments on magnet programs and the accompanying literature by July 15, in order to allow sufficient time for the literature to be printed and prepared by the end of July. Clear and articulate information about magnet programs and opportunities for interdistrict transfer shall be distributed to all students and parents in the three districts by July 31, 1981.

Each school district shall designate one or more desegregation representatives to go to schools within its district and meet with students and parents to explain the content of the magnet program and the interdistrict transfer program and encourage students to participate in these educational opportunities. It is recommended that an individual with experience in elementary education or elementary school administration be responsible for this task within the elementary schools. An individual with similar professional experience in secondary education should be responsible to encourage student interest and participation in magnet programs and interdistrict transfers at the junior high school and senior high school levels.

*Interdistrict Transfers:*

In addition to interdistrict transfer for participation in attractive magnet programs, any student, at any grade level, who is a resident in the Benton Harbor School District shall be given an opportunity to elect to attend school in either the Coloma or Eau Claire District. Likewise, any resident at any grade level, who is a resident in the Coloma or Eau Claire School Districts should be given an opportunity to elect to attend school in the Benton Harbor School District. The exercise of this choice should be limited to elections that will result in decreasing racial segregation in each school system. Educational and transportation costs related to the exercise of choice of interdistrict transfers shall not be borne by

the student or parent or guardian of the student involved, but shall be paid by the state and the district as stated below in the section of this opinion which discusses allocation of financial responsibility for this desegregation remedy.

*Exercise of Choice:*

The period for exercising a choice to participate in either of these programs in the 1981–82 school year shall begin on August 1, and end on August 20, 1981. In future years, the period for exercising choice to participate in a magnet program or to attend a school in another school district, under this plan, shall begin no later than May 1 and shall be open for one month, in the school year preceding the year for which the choice of attendance is made.

No student who exercises his choice during the open period shall be given a preference because of the date within the period on which he or she exercised that choice. A failure to exercise a choice within the open period shall not preclude any student or parent from exercising a choice at any time before the opening day of school for the year for which the attendance choice applies. However, the preference of any student exercising a late choice may be subordinate to the choices of students made before the expiration of the spring open choice period.

Public notice of the open choice period shall be published conspicuously in at least three newspapers of broad circulation within the three district area. This notice shall be printed at least three times in each newspaper, within the 30 days immediately preceding the beginning of the spring open choice period. Published notice shall explain the content of distinctive and attractive magnet programs. In addition, the notice shall explain the fact that the opportunity is open to students and parents in the three districts to elect to attend or send their child to attend any of the magnet programs or to exercise the choice of interdistrict transfers to schools where a student, by his or her race, will contribute to desegregation of the school population. The notice shall state clearly that any edu-

cational or transportation costs connected to interdistrict transfer or attendance in a magnet program will not be borne by the student or parent or guardian of the student. The deadline for exercise of such attendance choices shall be conspicuously stated, with a statement that choices may be exercised until the opening day of school, but that a choice made beyond the deadline may affect the preference of the student for a magnet educational program, should the program be full.

No interdistrict transfer made by a student under this plan to a district other than the district of his or her residence will jeopardize or adversely affect the eligibility of that student to participate in interscholastic athletics. Once a student has elected an interdistrict transfer, if he or she should return to the home school district, that student's participation in interscholastic athletics shall likewise not be affected by that decision. This information should be included in any literature distributed to students and parents describing opportunities to participate in magnet programs and interdistrict transfers under the court's plan.

*Superintendents Council.*

In order to assure communication among the school administration of these three districts, the superintendents of Benton Harbor, Coloma and Eau Claire shall form a Superintendents Council. This council shall meet at least monthly through the first year under this desegregation plan. These meetings will provide opportunities for meaningful discussion, at the highest level within the administration, of problems related to desegregation and interdistrict aspects of the plan. This dialogue among superintendents should include ongoing planning, discussion of constructive and cooperative solutions to problems in order to prevent repetition of problems relating to desegregation in the schools.

Each superintendent will be responsible for the safety of students who transfer into his school district under this desegregation plan. These superintendents should work together to devise plans that will prevent threats to the personal safety of any child

participating in an interdistrict transfer program.

Dr. Stolee will be available to attend Superintendents Council meetings, to consult with and advise superintendents in solving problems that arise in the course of this desegregation process.

## ACHIEVEMENT AND SOCIAL SKILLS

The problem of most concern to the court in addition to the racial separation and isolation of large numbers of children in these three school districts is the chronic low achievement levels of students in the Benton Harbor School system. At least 11 out of 21 elementary schools and all of the three junior high schools in the district have been identified by students performance on the 1981 state-wide achievement tests as having "high needs" in at least one, and more frequently in both, of the areas tested, i. e., reading and mathematics. These facts paint a picture of a school district in desperate need of assistance.

Dr. Stolee, the court's appointed expert, has recommended to the court that its plan include a program to improve the quality of instruction provided to students in the Benton Harbor School District and to raise the level of student achievement, until achievement within the district reaches the average attained by Michigan students in the Michigan Educational Achievement Program (MEAP). Establishment of an

achievement component in the Benton Harbor schools is crucial to any complete and effective remediation of harm that has resulted from defendant's unconstitutional segregative conduct. This aspect of the court's plan is important to a complete remedy in at least two respects. In its findings on liability, the court concluded that system-wide segregation, such as the Benton Harbor district has created and the State Board of Education condoned and perpetuated by its inaction, results in measurably reduced achievement.[20] In addition, of course, student achievement levels in the Benton Harbor district become particularly important in any voluntary desegregation plan. If Benton Harbor schools are going to attract students from Coloma and Eau Claire the schools must offer quality education and an atmosphere conducive to productive educational achievement.

Experts in education recognize that certain innovations in curriculum and in interpersonal relationships within the classroom exist and have been used successfully in other communities to reverse developmental and achievement lag. The court received testimony from Dr. Martin Maehr, Director of the Institute for Child Behavior and Development at the University of Illinois at Champagne, on the question of positive classroom intervention for the purpose of remediating damage to social and psychological development in a child.[21] In addi-

**20.** The court in its Phase I opinion on liability said: "Segregated black children tend to infer that they are isolated from the white majority because of their race, and, drawing on the observations of the deprivations experienced by black adults, they also tend to infer their own potential as limited because of their race. It is not surprising that black children have evidenced reduced self-esteem in a segregated environment and concomitant diminished motivation to succeed. The culturally-induced lack of self-esteem and diminished motivation in turn operate to measurably reduce achievement." *See, Berry v. Benton Harbor,* 442 F.Supp. 1230, at 1289 (D.C., 1977).

**21.** Research and writing on the issue of classroom interventions designed to improve self-esteem and achievement motivation include the following: Aronson, E., Stephan, C., Sikes, J., Blaney, N., and Snapp, M., *Cooperation in the Classroom,* Beverly Hills: Sage Publishing Company (1978); Asher, S.R., "Children's Peer Relations", in M. E. Lamb, Editor, *Social and Personality Development,* New York: Holtz, Reinhart and Winston (1978); Atkinson, J.W. and Raynor, J. O., Editors, *Motivation and Achievement,* New York: Wiley (1974); Carfield, J. and Wells, E.C., *100 Ways to Enhance Self Concept in the Classroom,* Englewood Cliffs, New Jersey: Prentice Hall (1978); Dweck, C.S. and Reptuci, N.D., "Learned Helplessness and Reinforcement Responsibility in Children", *25 J. of Personality and Social Psychology,* 109 (1973); Johnson, D.W., and Johnson, R., *Learning Together and Alone: Cooperation, Competition and Individualization,* Engelwood Cliffs, New Jersey: Prentice Hall (1975); McClelland, D.C., *The Achieving Society,* New York: Free Press (1961); Purkey, W., *Inviting School Success: A Self-Concept Approach to Teaching and Learning,* Belmont, California: Wadsworth (1978).

tion, Dr. Herbert Walberg, a professor of urban education and human development and learning at the University of Illinois at Chicago Circle, has testified to similar classroom interventions that have improved achievement motivation in children. Effective classroom techniques that will improve achievement and task performance in children should be designed and put in place in the Benton Harbor Schools. These interventions should be aimed at improving self-esteem, achievement motivation, social skills, coping, behavior, and vocational and career awareness in students at all grade levels.

This component will be entitled the Social Skills and Achievement Component of the court's plan. It shall be developed, implemented and evaluated by the school boards and the school district superintendent, under the supervision and with assistance from Dr. James P. Comer, of the Yale University Child Study Center. The court cannot emphasize too strongly, the critical importance of this component to a complete equitable remedy of the adverse effects of defendant's segregative conduct. The court expects the full cooperation of all staff and administration in the Benton Harbor School System working toward success of this intervention project. In addition, the court expects cooperation and assistance from the State Board of Education, and the Berrien County Intermediate School District in this venture.

These innovative efforts designed to remedy developmental harm may be extremely difficult and in some instances children may require one-on-one contact to achieve positive changes. The nature of the program will be determined by an assessment of the nature and extent of the damages, the obstacles to effective learning and achievement and the needs identified in the schools. The very sensitive areas of human development involved will require a high degree of competence in the staff members with responsibility for this component.

If these children have learned to believe that their situation in school or in life is hopeless, efforts in this component should try to teach them that there are opportunities for them and to believe in themselves as capable of operating effectively in new experiences. Before children can achieve and operate effectively, they must perceive themselves as capable of doing things if they try. That things are worth doing. That there are possibilities and opportunities open to them where they can achieve and succeed.

This component should begin with an evaluation of the Benton Harbor School System using diagnostic techniques, achievement testing, and classroom observation. Evaluators and teachers together should identify obstacles to effective learning and achievement and needs of students and faculty which must be met in order to overcome these obstacles.

The existence of these developmental and achievement problems demonstrate the destructiveness of negative racial attitudes and the severe impact on children and the quality of their lives that result from racial isolation that is not chosen but is imposed. These problems are undoubtedly complex. Consequently, it may take several years of dedicated work by competent professionals to improve achievement and performance levels in children in the Benton Harbor Schools. The court does not intend to put a fixed limit or termination date on the activity connected with this component. The court will retain jurisdiction to supervise the progress and problems in this component and reserves the right to make additional orders related to this achievement component as required to fully effect a complete, equitable remedy. The goal of persons working within this component will be to raise the level of student achievement, until achievement within the district reaches the average attained by Michigan students in state-wide achievement tests. Once that goal has been achieved, the program will be phased out over two additional school years.

The court has become familiar with the successful work of Dr. James Comer dealing with developmental and achievement problems in two inner city elementary schools in New Haven, Connecticut.[22] Dr. Comer is a professor of psychiatry at the Child Study Center of Yale University, and Associate Dean of the Yale University Medical School. Together with a staff of professionals, he has conducted a project in the Baldwin and King elementary schools in the inner city of New Haven, Connecticut, beginning in 1969. The project has been funded by a Ford Foundation Grant and Title I funds granted to the New Haven Public School System. Baldwin and King Schools are both predominantly black inner-city schools, that fell 33rd and 32nd in achievement levels among the 33 elementary schools in New Haven. After several years of involvement by the Yale Child Study Center team, achievement in these schools had improved to the extent that students in these schools scored the highest achievement scores of the 22 inner-city schools within the city.

The Baldwin-King intervention has been based on the premise that application of behavior sciences in schools and to classroom problems can create a social environment where children will learn more effectively and be motivated and able to achieve. The program has focused on efforts to improve the quality of relationships within the schools and to address developmental needs of children. The project staff found that behavior and developmental problems are soon experienced by children as academic failure. This failure leads to student frustration, anger, conflict, self-doubt, withdrawal and poor achievement. Improvement in the quality of relationships within the schools and increasing the period of contact between teacher and child to two years were seen as extremely important aspects of the program, resulting in the greatest improvement in behavior and task performance in the children.

Because of his exceptional success with similar problems in the New Haven School System, I have invited Dr. Comer to serve as a consultant to the Benton Harbor Area School District School Board in the area of social skill and achievement development. He has advised the court of his interest and willingness to participate in this undertaking. He intends to make an exploratory trip to visit the school district before the end of this school year. I have every confidence that Dr. Comer is qualified to undertake the task of developing a social skills and achievement component of this remedial plan. In addition to his competence, I believe that he will be able to establish a high degree of trust with the Benton Harbor School administration, staff, parents and students.

Dr. Comer will be responsible for working with the school district in developing, implementing, and finally evaluating, a social skills and achievement component of the court's plan. The threshold task for Dr. Comer will be to conduct an evaluation of the elementary schools and junior and senior high schools in the Benton Harbor School System. This evaluation process should use diagnostic techniques, achievement testing and classroom observation. Teachers should be given adequate release time to discuss with members of the evaluation team their perceptions of problems and student and teacher needs within the school system. He is encouraged to use any staff reasonably necessary to conduct a comprehensive evaluation, including qualified graduate students. An evaluation report and recommendations for an intervention program should be submitted to the court the school board and the Community Education Council by November 1, 1981. Rec-

22. Interventions used in this project and identified as having resulted in improved behavior and task performance in the children in these elementary schools are described in Comer, "Improving the Quality and Continuity of Relationships in Two Inner-City Schools", 16 *Journal of Child Psychiatry*, No. 3, at 535 (Summer 1976), in Comer, "The Education of Inner-City Children", 3 Grants Magazine No. 1, at 20 (March, 1980), and in Dr. Comer's recently published book, *School Power: Implications of an Intervention Project*, New York: Free Press (1980).

ommendations in this component should include plans, if appropriate, for coordination of this component with in-service training workshops and with the work of the in-service team in the schools.

The program shall begin no later than at the beginning of the second semester of the new school year. Dr. Comer will participate in the process of staff hiring for this component, in cooperation with the superintendent and members of the Benton Harbor School Board. In addition, he will act as a consultant to the social skills and achievement team and evaluate the performance of the team, reporting to the school board and the court on the accomplishments and problems of this component at the end of each semester.

In an effort to encourage and enhance the healthy cognitive, social and psychological development of children in the Benton Harbor schools, the court recommends to the school board that students entering grades 1, 2 and 3, in the next school year, remain with the same teacher through the 1982–83 school year. There are, of course, benefits and negative aspects to children remaining with the same teacher for a two-year period. However, the court is confident that the benefits gained from this change will outweigh any problems that it might create.

Among experts in the area of child development, it is recognized that the healthy, cognitive, social and psychological development of a young child requires affection, stimulation of inherent potential and continuing contact with a mature adult.[23] By increasing the period of contact between teacher and child to two years, teachers will have a greater opportunity to achieve more than superficial insights into the personal needs and problems these children are experiencing. This should facilitate early identification of and attention to children who are at high risk of suffering academic failure. In the course of two years, teachers should have more opportunities for contact with parents. These contacts should be used by teachers to consult about children's needs, to develop better relationships with parents and to encourage parents' participation in the classroom, extracurricular activities, and school events. Parent cooperation with the school staff is crucial to stimulating achievement and for mutual understanding of problems and opportunities to meet responsibilities to these children. Finally, two years spent with one teacher will eliminate the separation anxiety that young children experience at the end of the school year. Basically a greater understanding of and involvement in a student's life can be expected from spending two years with a child. In addition, the child's bond with a teacher may become more firmly established. Because of the importance of this relationship to the child's development and the advantages of increased student-teacher contact, I am directing that the school board, in establishing pairings of inner-city, predominantly black schools with white, outlying schools, place a high priority on structuring clusters and school assignments in such a way that students will spend four years in grades 1 through 4 in one elementary school.

Inclusion of this achievement component is consistent with the basic rule that where constitutional violations have been found, the remedy should be tailored to cure the "*condition* that offends the Constitution". *Milliken I, supra*, 418 U.S. at 738, 94 S.Ct. at 3124 (emphasis added). The "condition" offending the Constitution in Benton Harbor Schools is *de jure* segregation in the school system. This substantial and continued segregation has resulted in more than the physical separation of children of different races. The need for improvement in achievement motivation and academic performance flows directly from the constitutional violations by both state and local officials in their action and inaction. This achievement intervention is necessary to restore victims of discriminatory conduct to

**23.** *See*, Bowlby, J., "The Purpose of the Family", in *Maternal Care and Mental Health*, Geneva: World Health Organization at pp. 67–71 (1952), cited in Comer, *Journal of Child Psychiatry, ibid.*

the position that they would have enjoyed in terms of educational opportunities and performance had attention to their needs been provided in a nondiscriminatory manner, in a school district free of *de jure* segregation.

Educational and achievement opportunities in segregated schools have long been recognized as "inherently unequal". *Brown v. Board of Education*, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) (*Brown I*). The Supreme Court has approved inclusion of educational intervention to overcome the effects of a segregated school system in a desegregation remedy plan. *See, Milliken v. Bradley*, 433 U.S. 267, 279–288, 97 S.Ct. 2749, 2756–2761, 53 L.Ed.2d 745 (1976).[24]

### CURRICULUM

The goal of any successful desegregation plan must include not only physical contact between children of different races, but also active recognition and appreciation of the black man and woman's contribution to history, literature, science and the arts. Above and beyond this, curriculum in desegregated schools should encourage the equal status of black students and provide equal opportunities for them to achieve and succeed. This aspect of the plan suggests innovations in curriculum content and process to ensure that these goals are achieved within these three school districts.

Coloma and Eau Claire School Districts are directed to review and evaluate curriculum content, textbooks and teaching materials used in all classes at all grade levels within their school system. The purpose of this systematic evaluation is to ensure that curriculum content, textbooks and teaching materials are free of cultural bias and depict multi-racial roots and contributions to American society. Where curriculum and materials fall short of meeting the goal of offering an education which provides a mul-

---

**24.** The court in *Milliken II*, cited with approval several decisions of the Fifth Circuit Court of Appeals which upheld the inclusion of remedial educational intervention as parts of desegregation remedy plans.

In that opinion, the court said:

In 1967, the Court of Appeals for the Fifth Circuit, then engaged in overseeing the desegregation of numerous school districts in the South, laid down the following requirement in an en banc decision:

"The defendants shall provide remedial education programs which permit students attending or who have previously attended segregated schools *to overcome past inadequacies* in their education." *United States v. Jefferson County Board of Education*, 380 F.2d 385, 394, cert. denied, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967). (Emphasis supplied.)

See also *Stell v. Board of Public Education of Savannah*, 387 F.2d 480, 492, 496–497 (CA5 1967); *Hill v. Lafourche Parish School Board*, 291 F.Supp. 819, 823 (ED La.1967); *Redman v. Terrebonne Parish School Board*, 293 F.Supp. 376, 379 (ED La.1967); *Lee v. Macon County Board of Education*, 267 F.Supp. 458, 489 (MD Ala.1967); *Graves v. Walton County Board of Education*, 300 F.Supp. 188, 200 (MD Ga.1968), aff'd, 410 F.2d 1153 (CA5 1969). Two years later, the Fifth Circuit again adhered to the rule that district courts could properly seek to overcome the built-in inadequacies of a segregated educational system:

"The trial court concluded that the school board must establish remedial programs to assist students who previously attended all-Negro schools when those students transfer to formerly all-white schools.... The *remedial programs ... are an integral part of a program for compensatory education to be provided Negro students who have long been disadvantaged* by the inequities and discrimination inherent in the dual school system. The requirement that the School Board institute remedial programs so far as they are feasible is a proper exercise of the court's discretion." *Plaquemines Parish School Bd. v. United States*, 415 F.2d 817, 831 (1969). (Emphasis supplied.)

The Court went on to say:

In the 1970's, the pattern has been essentially the same. The Fifth Circuit has, when the fact situation warranted, continued to call for remedial education programs in desegregation plans. *E. g., United States v. Texas*, 447 F.2d 441, 448 (1971), stay denied *sub nom. Edgar v. United States*, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed.2d 10 (1971) (Black, J., in chambers). To that end, the approved plan in *United States v. Texas* required:

"[C]urriculum offerings and programs shall include specific educational programs designed to compensate minority group children for unequal educational opportunities resulting from past or present racial and ethnic isolation ...." 447 F.2d, at 448. (Footnote omitted.)

ti-racial perspective of American society, recommendations for change should be made.

The superintendent of Coloma and Eau Claire School Districts are directed to prepare a report including identification of any changes in curriculum, textbooks and/or educational materials recommended and implemented as a result of this curriculum evaluation. These reports should be submitted to the respective school boards of each district by October 15, 1981.

Both Coloma and Eau Claire School Districts are directed to adopt an affirmative education policy that textbook selection at all grade levels be monitored and approved for lack of racial bias and depicting black participation in all aspects of American learning, society and culture.

In each high school in these three local school districts, the curriculum shall include an annual elective course on American race relations. Each course should include reading, discussion and study of the history of race relations in this country and efforts to improve relationships between the races. Additional opportunities to study black literature, history, music, and art should be available in separate courses or included within existing course offerings at the high school level at each district. In addition, the court recommends that study of minority cultures be included in curriculum at all grade levels throughout these three school districts.

Extracurricular activity in each district should reflect the presence and cultural interests of black students within the study body. Plays, music concerts, dances, extra-curricular trips, and classroom guests should all reflect appreciation for black culture and the achievements of black persons.

Curriculum process is equally important to the success of this desegregation effort

as is curriculum content. Teaching methods should be used to encourage positive interpersonal relationships and cooperation in integrated classrooms. Teachers should be encouraged and reinforced for developing social conditions within their classrooms that support the equal status, anxiety-free interaction, mutually-dependent and task productive contact between children of different races. This kind of educational environment can be achieved by instructing students to participate in interdependent work on tasks with group rewards for a cooperative and successful work product. Principals in each school shall be responsible for assuring that teachers are made aware of and encouraged to read about and experiment in their classrooms with techniques that place students in situations that produce and maintain a perception of equality with students of other races.[25] Teachers should be encouraged to share ideas and reports of classroom experiences with experimental techniques used to encourage equal status interaction and conflict-free interaction between children of different races. Teachers should be permitted opportunities to work jointly on implementing cooperative, interdependent tasks in their classrooms under this section of the plan.

Teachers should be encouraged to report to their school principals, district superintendents and share with the Community Education Council their observations of student interaction and experiences in using innovative techniques in their classrooms under this section of the plan.

### ADMINISTRATIVE, TEACHER, AND STAFF REASSIGNMENT AND AFFIRMATIVE ACTION

Faculty reassignment shall be used in two ways under the court's plan. First, Benton Harbor School District shall completely de-

25. The court recommends to the principals in the Benton Harbor school systems two articles which review experiments in instructional techniques used in inter-racial classrooms. Cohen, Lockheed and Lohman, "The Center for Inter-racial Cooperation: A Field Experiment," 49 *Soc. of Educ.* 47 (1976) and Lucker, Rosenfield, Sikes and Aronson, "Performance in the Inter-

dependent Classroom: A Field Study", 13 *Am. Educ. Research J.* 115 (1976). Both articles are cited and discussed in Chesler, M.A., Crofoot, J.E., Bryant, B.I., "Institutional Changes to Support School Desegregation: Alternative Models Underlying Research and Implementation", 42 *Law and Contemporary Problems*, 174, at 203 (Autumn 1978).

segregate its faculty in each school building. Neither white teachers nor black teachers shall be isolated in any school within the district. No school shall retain any indicia of racial identifiability by the racial composition of its faculty. Secondly, two-year interdistrict transfers of black teachers from Benton Harbor shall be used to create immediate desegregation of the faculty in the Coloma and Eau Claire school districts. After two years, each of these school districts is expected to have accomplished significant affirmative action hiring within its district. While the integrity of each district must remain intact under the court's plan, there is no reason why teachers may not and should not be reassigned among the districts to achieve desegregation of school faculties.

### I. Benton Harbor

Hiring and assignment of administrative, faculty and staff support personnel shall reflect a commitment to desegregation within the Benton Harbor School District. Each school building within the Benton Harbor system should have a desegregated faculty, which in its racial balance reflects the racial makeup of the total school system faculty population.

*Teachers.*

Integrated faculties within each school should operate as an advantage for both faculty members and students in adjustment to desegregated education. Faculty integration within each school contributes to effective and successful desegregation in at least two respects. First, teachers have the benefit of the opportunity to share ideas, perceptions of race related and achievement problems, and advice on creative classroom interventions with colleagues of both races. This opportunity should be used to obtain greater understanding and insight into problems children experience in adapting to a desegregated school environment. In addition, a desegregated faculty provides students with the benefit of both black and white role models within their schools and the opportunity to observe adults involved in interracial relationships and cooperative efforts to achieve common goals.

Reassignment necessary to achieve racial balance within each school can be accomplished without a great deal of disruption by using the following means. First, teachers in schools that are closed under this plan should be reassigned in such a way that they promote racial balance in other schools. Second, attrition of teachers leaving the school system should be used in such a way that newly-hired faculty enhance the racial balance in the schools. Third, a list of volunteers for reassignment should be prepared by the superintendent and needed reassignments should be made from that list. Teachers should be encouraged to volunteer for intra-district reassignment. The purpose of the reassignment plan and benefits of racial balance among faculty members within each building should be explained to teachers in an effort to solicit their voluntary cooperation. Teacher assignments within each school should approximate the racial composition of the faculty for the whole school district.

In addition, volunteers from among black teachers should be solicited and encouraged for interdistrict reassignment to Coloma and Eau Claire to facilitate student acceptance of and adjustment to desegregation and to achieve integration of the faculty in those school districts. This aspect of the plan is discussed further in the section below on Coloma and Eau Claire teacher reassignment.

*Administration.*

Only five of 16 principals in the Benton Harbor school system are black. The court recommends that, in order to facilitate effective desegregation within the system, vacancies in principal positions be filled in such a way that at least 50% of these administrative positions are eventually held by black professionals. This will assure that a black voice and a black perspective on school problems is heard within the administration. In addition, it will avoid identification of the chief building executive position as a position that is preferably held by white persons.

*Staff:*

Other professional staff and nonprofessional support staff positions within the school system are held by a disproportionate number of white people. Efforts should be made to increase black representation among school nurses, secretaries, and maintenance personnel. An affirmative action plan should be developed by the district that targets at least 50% black representation in these and other job categories where blacks have been under represented. No job category within the system should become racially identifiable.

The superintendent should report to the BHASD school board and the court-established Community Education Council (CEC), by September 20, 1981, the details of teacher hiring and reassignment done to achieve the goals established by the court in this component of the plan. The superintendent should as well prepare a report at the end of each school year on the progress of the district in achieving affirmative action goals established under the direction of this plan. This report should annually be submitted to both the school board and the CEC.

## II. *Coloma and Eau Claire*

In order to realistically attract students to take advantage of interdistrict transfer opportunities and distinctive magnet programs in Coloma and Eau Claire School Districts, there must be some black representation on the faculties in each of these school districts. New hiring and teacher reassignment should be used to achieve 10% black representation on the faculties within each of these school districts. If the faculties continue to be made up of all white teachers in each of these districts, students are less likely to feel comportable and secure in choosing to take advantage of desegregated educational opportunities open to them under this plan in each of these districts. Black teachers should be represented throughout all grade levels in both Coloma and Eau Claire School Districts.

This reassignment should be achieved initially by voluntary teacher exchanges and interdistrict transfers. Superintendents in each of these three local school districts should encourage teachers to volunteer for interdistrict reassignment. The purposes and advantages of desegregated faculties to the success of the total desegregation process should be clearly explained to teachers in an effort to encourage their cooperation in this aspect of the court's plan. Literature should be prepared by each district superintendent with the assistance of a court representative, before the end of the school year, to solicit voluntary interdistrict reassignment of teachers. Existing faculty, new faculty hiring and voluntary teacher exchange and interdistrict transfer should achieve the 10% goal for black teacher assignment to Coloma and Eau Claire in the 1981–82 school year. Voluntary teacher exchange between Benton Harbor and Coloma and Benton Harbor and Eau Claire supplemented by any necessary black teacher reassignment to Coloma and Eau Claire should be continued for two years. At the conclusion of two years, affirmative action hiring of black teachers in Coloma and Eau Claire should achieve 10% black teacher representation on the faculty in each of these districts for the 1983–84 school year.

Both Coloma and Eau Claire School Districts shall prepare as a part of their participation in this desegregation plan, an affirmative action plan which establishes goals for hiring within the next five years for each job category within their school districts. Both school districts shall prepare at the end of each school year, a report on their progress in establishing and achieving affirmative action goals, to be submitted to their respective school boards and to the court-established Community Education Council.

## IN–SERVICE

Desegregation of schools that have been predominantly white or predominantly black brings with it much more than the physical movement of children and introduction of new classmates of a different race into a classroom. Emotional and psychological adjustments are going to be required of all members of the three districts

affected by this court's desegregation plan. Implementation of district-wide pupil transfers in Benton Harbor and interdistrict programs are inevitably likely to cause some disruption and perhaps resentment. In addition, students and faculty who have spent most of their lives separated or isolated from members of the opposite race may bring with them fears, preconceived notions and attitudes toward members of the other race which could jeopardize their own personal adjustment to desegregation and success of the plan.

It is the responsibility of the school boards in each district to reassess their attitudes towards desegregation and to assure that their superintendents are committed to supporting desegregation and quality education in the interdistrict aspects of this plan. The superintendents in turn are responsible for assuring that their principals support the court's desegregation plan. It shall be made clear to faculty members in each district that there is no place within these districts for teachers who are not committed to desegregation in these public schools. The constitution requires that where there has been a history of segregative practices, and such a history has been demonstrated here, that desegregation must be achieved. Professionals working in public education are obligated to support desegregation that is introduced under these circumstances. There is no place in any of these districts for teachers who are not committed to remedying the constitutional violations that have been found by this court.

The organizational structures of the three districts may require modification to encourage and assure successful adjustment to desegregation. If a high priority is going to be placed on creating opportunities for black children to achieve and succeed, new organizational structures and rewards may need to be employed to encourage and reinforce new kinds of behavior. In a community where the development and achievement levels of black children have been allowed to lag, some new dynamics must be introduced into the system to affect that lag in development. Attention must be paid to the needs of these children. Attention must be paid to the attitudes towards these children and to the degree of concern for, understanding of and perception into their problems, within the system.

This adaptation, examination of attitudes and behavior cannot be expected to come easily or automatically. Members of the school community are entitled to some assistance in understanding and coping with the new stresses and adjustments that can be expected to be introduced with desegregation.

To address this anticipated need, I am directing these three school districts to develop, participate in and finally evaluate an in-service workshop component of the plan. The joint School Boards will be responsible for articulating policy, consistent with this court's opinion, for a series of effective workshops. In addition, the school boards will be ultimately accountable for the quality of services delivered in this component. Program content and process should be recommended to the boards and ultimately developed and implemented by the superintendents of each school district acting cooperatively and in cooperation with the superintendent of the Berrien County Intermediate School District and a representative of the State Board of Education, with the assistance of appropriate staff or consultants.

In-service training workshops shall include mandatory participation by all members of the school districts, including: school board members, administrative personnel, faculty, all support staff and students. In addition, opportunities must be created for meaningful parent participation in workshops and their involvement should be actively encouraged.

The agenda detailed by the court in Appendix A includes opportunities for explanation of the court's plan and orientation to that plan for all members of the school community. These spring workshops are to be the beginning of the in-service component of the plan. Participation of skilled and qualified members of an independent

in-service team should be included in these orientation and workshop events. Participation by members of the school communities in at least one of these orientation workshops should be mandatory.

In addition, each school district is directed to prepare and implement three days of intensive faculty and support staff workshops to be conducted immediately following the last scheduled day of school in this school year. These workshops should include an opportunity for teachers to evaluate the content and process of the workshops. Thorough understanding by all members of the three district community of the components of the court's plan and clarification of the role to be played by administration, faculty, support staff and students should be a goal for each district to be met before the end of this school year. The summer should be used for planning agendas for in-service workshops to be conducted through the following school year.

Wherever possible, the three districts should work together and plan joint in-service events that include teachers and administrators from the three districts. These may be done in grade level groupings of teachers and principals, in smaller groups or in one-on-one classroom visitation days. Teachers should be given sufficient release time throughout the school year to engage in meaningful contact with teachers of other races to exchange perceptions of problems related to desegregation and ideas for effective intervention to address those problems in their classrooms.

Without intending to usurp the role of the school boards and administration in this component, there are several goals and objectives that should be identified which the court expects to be incorporated in workshops which the court is directing the districts to conduct. Several of these goals were originally recommended to the court in the Foster/Green report. The district superintendents and chairmen of school boards as well as any members of any in-service planning committees should become familiar with recommendations made in that report, excerpts of which are attached to this opinion in Appendix D.

The overriding purpose and goals of workshops conducted as part of the court's plan is promotion of inter-racial cooperation and understanding within and among these school districts. The objective in conducting these workshops is to prevent legitimate fears and concerns from escalating into major conflicts that jeopardize adjustment to desegregation and success of the plan. Workshops should be seen as structured opportunities to communicate feelings and concerns related to the desegregation process, as well as occasions to gain insights and understanding that enable people to cope with this new experience and contribute to its success.

Participants in these workshops should: (1) examine their own values, attitudes and behavior toward members of other racial groups and the impact that these attitudes and behaviors have on development and academic achievement of students; (2) develop insights and skills necessary to deal effectively with conflicts related to racial desegregation and tensions between racial groups; and (3) increase their sensitivity and attention to the needs of children in their adjustment to desegregated classrooms. These goals are not intended to be exhaustive. It is the role of the school boards, acting in cooperation with the superintendents of these three school districts, with the assistance of the superintendent of the Intermediate School District and the State Board of Education, to develop policy, program goals and methods for implementation that will enhance adjustment to desegregation and success of the plan.

The leadership role of superintendents and principals in adaptation to and acceptance of desegregation should be strongly emphasized. In addition, each member of the faculty must understand the critical importance of parent participation in school activities and to the successful achievement of each child. Techniques that have been successful in achieving parent involvement and positive perceptions of schools on the part of parents should be explored and goals should be adopted by each faculty member to achieve that end.

Finally, the importance of the role of guidance counseling personnel and any psychologists or social workers on the staff of these districts should be impressed upon those staff members. These individuals should be included in three days of intensive workshops conducted at the conclusion of the school year, focusing on development of techniques which will prevent academic and social failure in desegregated schools. In addition, they should be prepared to assist teachers in early identification of problems in development and achievement lag and in designing interventions that constructively pay attention to the problems of students with high risk of social or academic failure. An achievement component of the plan will be developed to bring professional focus and assistance to correct the problem of developmental and achievement lag in the Benton Harbor School District. Staff guidance counsellors, social workers, and psychologists in the Benton Harbor Schools will be expected to cooperate fully with the persons responsible for developing and implementing that achievement component.

The school districts should engage the services of an independent team to consult on preparation of workshops and to conduct in-service workshops throughout the 1981–82 school year and for the following two school years. The team should identify persons on the school staff who may make a positive contribution to the in-service agenda and actively use those persons in conducting workshops. This inclusion of staff should be embarked upon with the intention that the in-service component of the program may become a self-sufficient program incorporated into the school's curriculum and staff development when the in-service team discontinues its involvement with the districts under this order.

The in-service team should be bi-racial and combine expertise and experience in the following areas: urban inner-city education, rural education, high school counsel-ing, work with adults and children from different racial groups, social classes and cultural backgrounds and understanding of child development. In the Benton Harbor school system, members of the in-service team are expected to work cooperatively with the persons responsible for the achievement component of the court's plan.

## DISCIPLINE

Students' perception of and feeling of fairness in the schools is absolutely critical to the success of this or any desegregation plan. Without clearly established standards of both expected behavior and unacceptable conduct an environment where students are treated fairly cannot develop. Some educators believe strongly that achievement is significantly related to perception of school fairness.[26] Consequently, the task of developing a clear and fair code of conduct and discipline is of special importance to the desegregation process and should be carried out early on in that process.

A good uniform code of conduct alone does not create an atmosphere of fairness within these schools. Enforcement by teachers and administrators on a day-to-day basis is equally important in creating a feeling of fairness in the students of these three districts. In desegregated schools it is not unusual that rules may be administered, inadvertently or deliberately, in a way that minority students may be caught and/or punished more frequently and in different degrees than white students. Special attention should be paid by staff members in each of the three districts to their personal attitudes that may contribute to this potential problem, especially for interdistrict transfer students.

It has been recommended to the court in testimony at the remedy hearing that a bi-racial, representative committee of parents, students, teachers, administrators, and school board members and interested community members be established for the purpose of developing a uniform discipline

26. *See,* Forehand, Ragosta and Rock, Conditions and Processes of Effective School Desegregation (Office of Education Reports No. ETS-PR–76–23, July 1976) (ERIC Document No. 131 155) Cited in "Alternative Models", *Ibid.,* at 181.

code. It is the hope and expectation of the court in following this advice that the existence of clear, unambiguous and uniform standard of conduct and procedures for discipline will eliminate the interjection of personal bias and subjective enforcement that may be exacerbated by negative racial attitudes. In order to facilitate the three-district joint program in the court's plan there should be a high degree of consistency in expected conduct and in discipline codes in the three districts. Conduct expected of students and procedures for fair discipline should be understood by all administrators, teachers and students.

Consequently, I am directing the superintendent and the chairman of the school board in each district to appoint members to a 21-person, three-district committee on student conduct and discipline. The responsibility of this committee shall be to recommend to the school boards a uniform code of conduct and discipline for the three districts. Their report shall recommend clearly-established standards of expected behavior and unacceptable conduct, as well as clear and fair procedures of enforcement.

The committee shall be racially representative and include persons who are genuinely committed to the success of the desegregation effort. The committee shall be made up of the following representatives: (1) the principals of the senior high schools in each district; (2) a representative of the school board from each district; (3) four parents, including two from Benton Harbor and one each from Coloma and Eau Claire; (4) four teachers, including two from Benton Harbor, and one each from Coloma and Eau Claire; (5) three students, one from each school district; and (6) four interested community members, including two from Benton Harbor and one each from Coloma and Eau Claire. It will be the responsibility of the superintendent and the chairman of the boards of education from each district to name their school district representatives to this joint committee.

The committee should focus on establishing a basically fair code of conduct and behavior as well as sound, equitable and effective consequences for violations of the code of conduct. Conduct warranting suspension or expulsion should be clearly defined. Use of suspension or expulsion should be limited to a last resort and the committee should explore the use of effective alternatives to suspension or expulsion. Discipline procedures should include an opportunity for a prompt appeal by a student or parent to a bi-racial panel of administrative orders to remove or suspend a student. To the extent possible, the committee should explore and incorporate in its report recommendations to eliminate or minimize the opportunity for interjection of personal bias or negative racial attitudes in enforcement of discipline. Finally, the committee should avoid the use of excessive numbers of rules. An atmosphere that relies too heavily on rigid control of student behavior may become counterproductive.

Any code recommended by the committee shall clearly prohibit the use of racial epithets to antagonize others. In addition, possession of weapons on school premises shall be prohibited. Possession of weapons, in addition to other serious discipline problems, have been evident in the Benton Harbor senior high school.[27] Committee members should be made aware of the work done by an Ad Hoc Committee on School Safety in the Secondary Schools in the Benton Harbor Area School District. Each committee member should read the report of that committee presented to the Benton Harbor Board of Education on April 1, 1980. Some of the recommendations included in that report bear directly on questions of disciplines and proper school conduct.

The committee on conduct and discipline should submit its report and recommendations to the school district of each of the school districts for adoption. The report of

27. This information came to the attention of the court in a "Report of the Adhoc Committee on School Safety in the Secondary Schools" presented to Dr. James Hawkins, Superintendent of the Benton Harbor Area Schools, and the Board of Education for the Benton Harbor Area Schools, on April 1, 1980.

this committee should be completed by November 30, 1981, with the intention that a uniform conduct and discipline code be implemented in the second semester of the 1981-82 school year.

It is equally important that once an appropriate uniform policy of conduct and discipline has been adopted that it be understood by administrators and faculty, be communicated to students and parents and enforced fairly. The committee shall be responsible for developing a plan to communicate the code to parents. The court anticipates that the Community Education Council will have an active role to play in distribution of the code. In addition, the code of conduct and discipline, once adopted, should be published and distributed to students, faculty, staff, board members and parents and incorporated, as well, in in-service workshops for each of these groups of interested people. In the future, the published code should be distributed to students and parents at the beginning of each school year, in the opening week of school.

## COURT'S REPRESENTATIVE FOR IMPLEMENTATION

The court has asked Dr. Michael J. Stolee to act as its representative to assist the school districts in the process of implementation of the remedy plan. Throughout the body of the opinion there are several references to tasks to be completed with his assistance.

First of all, Dr. Stolee's presence and role in this desegregation process is warranted to assure that there is consistent and unbiased explanation of the court's plan throughout these three school districts. It will be his responsibility to explain the plan to the superintendents, central administration and members of the school boards of these three local school districts. He will act as the court's representative at an initial, joint meeting of the members of the three local school boards and the intermediate school board to be held within several days after the court's opinion has been issued. In addition, explanation of the plan to teachers, support staff, students and par-

ents will be done by Dr. Stolee or under his supervision. A schedule for explanation of the plan has been set out in Appendix A to the court's opinion. He has been asked to prepare a brief media explanation of the plan. This media presentation will be used by the school districts and made available to the communities to assure that accurate and consistent information about the plan is communicated throughout these three communities.

Dr. Stolee will be available as a consultant to the superintendents of these school districts in the initial stages of desegregation. The Benton Harbor district has been directed to adopt a student reassignment and transportation plan that will desegregate its schools and eliminate racial identifiability of schools. This will be accomplished by a staff committee appointed by Dr. Hawkins, the Superintendent of the Benton Harbor Schools, acting with assistance from Dr. Stolee. In addition, the superintendents of these three school districts, together with the superintendent of the Intermediate School District, have been directed to form a Superintendents' Council. This Superintendents' Council should meet at least monthly through the first year of the desegregation plan. Dr. Stolee will meet regularly with the superintendents, in an effort to facilitate establishing a cooperative and continuing relationship between them. Dr. Stolee brings valuable expertise to this task including expertise in educational administration, broad familiarity with the process of desegregation in other cities and school districts, and finally, he has achieved some familiarity with these three districts from having served as the court's expert through the remedy stage of this litigation. His presence and availability to the superintendents of Benton Harbor, Coloma, and Eau Claire should enhance cooperative, three-district adjustment to desegregation.

In addition, where problems arise, he will be available to give counsel and hopefully resolve disputes by suggested solutions rather than expose the parties to lengthy, expensive and time-consuming court hear-

ings. It is not my intention that Dr. Stolee act in the capacity of a czar or as the court's spy in the area. He will be a consultant and advisor. He will bring a wealth of desegregation experience, common sense and good judgment to communities historically short in these qualities.

## COMMUNITY INVOLVEMENT AND MONITORING

Each plan that the court has received and reviewed has emphasized the critical importance of community involvement to assure the effectiveness of this or any other desegregation effort. In fact, it has been suggested that the ultimate success of the plan will be directly related to the extent and level of support that can be generated for it in the three communities in the desegregated area. The experience in other communities has shown that whether parents are for or against school desegregation, their support rises as they increasingly feel that they have an effective voice in district policymaking concerning desegregation.

Efforts are being made by the court within the plan to encourage parent understanding of the plan and parent involvement in classroom and school activities. These are part of a deliberate effort to achieve the important goal of community involvement in the schools, in support of desegregation and in improving achievement motivation in the Benton Harbor Schools.

In order to facilitate an initial and ongoing peaceful and cooperative adjustment to desegregation within these school districts, the court will establish a broad-based, racially representative Community Education Council (CEC). This council will function and serve in several important capacities within the initial years of desegregation under the plan. The council will create a forum for interested community members to share information about the desegregation process. In addition, perhaps of equal value to sharing of information is the potential for the development of personal relationships and trust that will allow controversial issues to be explored and discussed.

*Membership.*

The CEC will include members representing each of these three communities. The court will attempt to identify and include persons who are interested, aware and able to influence orderly and positive adjustment to school desegregation. Efforts will be made to reflect the urban and suburban, racial and socioeconomic makeup of these three districts in selecting persons to sit on the council. Established community resources and institutions, including churches, law enforcement officials, representatives of state and local governments, civic groups, foundations, business and industry, labor, and a local college, as well as parents and students, will be represented in the membership of the council. Members of the CEC will be appointed initially to serve through June of 1982.

*Purposes.*

The purpose of the organization will be to bring together parents, citizens and organizations committed to working for the preservation and promotion of quality and stable desegregated public schools in the three districts. The organization must be pro-public schools, but neither for nor against busing for desegregation. To put it simply, the goals and objectives of the Council will be to assure: (1) accurate and adequate public information about all aspects of the desegregation process; (2) continuing quality public education; (3) citizen involvement in the process of desegregation; and (4) peaceful and effective implementation of the court order.

The CEC will operate as a liaison between the broader, three district communities and the school districts. As part of its role as liaison with the communities, the CEC should assure that every effort is made to achieve a broad based community awareness and understanding of the court's plan, its purposes and the process of implementation of that plan. The Council shall provide each of these communities with meaningful opportunities to become accurately informed about the court plan and the desegregation process. In addition, the CEC shall establish cooperative relation-

ships with governments at all levels, business and industry, the local college and other community resources to strengthen the effectiveness of school programs. Problems perceived by the community related to schools and the desegregation process should be communicated by the council to the school boards and school administrators. The court is hopeful that through this line of communication, legitimate concerns and fears within the schools and the communities can be addressed and prevented from escalating into conflicts that jeopardize personal adjustment to desegregation and success of the plan.

The school boards and school district administrators should consult with the CEC on problems they experience related to implementation of desegregation and solicit recommendations and advice on ways of reaching constructive solutions. Where appropriate, members of the CEC may be used to resolve problems by mediation and conciliation. Members of the council should make every effort to be aware of community feelings and concerns in the initial years of desegregation. It will be the role of this council to articulate community concensus on appropriate methods and actions to solve problems that arise in the desegregation process.

Finally, the council will be the primary body monitoring implementation of the court's order on behalf of the court. The CEC as part of its responsibilities shall follow the progress of the school districts in their adjustment to desegregation. The council is expected to make recommendations to the school boards in areas where it perceives the school district(s) may be failing to fulfill the objectives of the plan. The council shall monitor compliance with the objectives of the court's plan by other defendants as well. The CEC shall report at least semiannually, during the school year, to the court on progress toward meaningful desegregation in these three school districts. The CEC will not co-manage or make policy for the Benton Harbor, Coloma or Eau Claire schools. Neither will it assume the responsibilities of the school boards and superintendents or any other

defendants in carrying out the court's order.

Despite the important and valuable role the court is assigning to the CEC, I wish to make clear that it is not being set up to become a "super" school board. The schools will continue to be run by the elected school boards through their superintendents and staff personnel. It is the primary responsibility of the school boards, together with the other defendants, to implement to the fullest extent possible the desegregation remedy plan ordered by the court.

## TIMETABLE

Throughout the body of this opinion the court has directed that reports on aspects of the desegregation remedy be prepared and submitted to the court and the three district school boards. The court has, as well, established several deadlines for completion of tasks throughout the opinion. Where it has been ordered that reports be submitted to the court, copies shall be served on the court-appointed representative for implementation and the chairman of the CEC. The defendants, their officers, and their employees shall take all actions necessary to accomplish the steps set out below, on or before the dates listed:

(1) May 12, 1981: Report to the court and the Benton Harbor School Board from superintendent of the BHASD on pupil reassignment plan and transportation plan, for reassignment of students within pairings and clusterings in the Benton Harbor school system for the 1981–82 school year.

(2) June 30, 1981: Report to the court and each district school board from each superintendent on content of the inservice workshops conducted in May and June of 1981, evaluation of their effectiveness and recommendations for additional issues that should be included in fall inservice workshops.

(3) July 1, 1981: Report to the court and the school boards from the magnet

programs committee on magnet programs to be put in place in the 1981–82 school year and planning for magnet programs in the 1982–83 school year; and proposed literature on magnet and interdistrict transfer programs to be sent to students and parents.

(4) July 15, 1981: School boards shall have completed their review and comments on proposed literature to be sent to students and parents describing magnet programs, interdistrict programs and opportunities to elect to participate in either of these programs. Literature should be sent to the printer.

(5) July 31, 1981: Literature described above, on magnet and interdistrict transfer programs should be sent to students and parents in each school district.

(6) Summer 1981: Joint report to the court and the school boards from the three district superintendents and inservice team, reporting the content and agenda of fall intensive workshops for teachers and students to be conducted in the week before the opening day of school.

(7) August 25, 1981: Joint report to the court and the school boards from the three district superintendents on student elections to participate in magnet programs and interdistrict transfers; and transportation plan for interdistrict transportation of students.

(8) September 20, 1981: Report to the court and to each respective school board from each school superintendent on teacher hiring, reassignment and affirmative action goals for faculty and staff; and joint three district report on interdistrict teacher reassignment.

(9) October 15, 1981: Report to the court and the Coloma and Eau Claire school boards from the Coloma and Eau Claire school district superintendents on curriculum and textbook racial bias evaluation.

(10) November 1, 1981: Report to the court and the Benton Harbor School Board from Dr. Comer evaluating achievement problems identified in Benton Harbor schools.

(11) November 30, 1981: Report to the court and school boards from school conduct and discipline committee on uniform conduct and discipline code; time should be permitted for comment and recommendations before approval and adoption by each school board.

(12) June 30, 1982: Annual desegregation progress report from each school district superintendent; parts of this report should be completed jointly by the three district superintendents.

*Annual Desegregation Progress Reports.*

At the end of each school year, the superintendent of each of these three local school districts shall prepare a report that details the district-wide involvement and performance in implementation of the court's desegregation plan, of each district in the previous school year. Sections of the report on interdistrict magnet programs, interdistrict transfers, interdistrict teacher exchanges, interdistrict in-service workshops should be completed jointly. These reports should be submitted annually after the closing of the school year on June 30 of each year.

The annual desegregation progress reports shall contain the following information:

(1) the number of students by race enrolled in each school district, in each school, in each classroom in the three local school districts;

(2) the number of teachers by race in each district and assigned to each school within the district; description of teacher reassignment, affirmative action goals established and achievement of those goals;

(3) the number of staff in each job category by race in each district;

(4) the number of students electing to participate in the magnet programs and interdistrict transfers from each school district, with identification of the programs or schools where children are attending;

(5) within the Benton Harbor School District, the number of students by grade level and by race transported to achieve desegregation under the plan;

(6) the number of students suspended, the basis for each suspension and the length of each suspension; and the number of students expelled and the basis for expulsion; both broken down by race and indicating the dates of the disciplinary action;

(7) student achievement information for fourth and seventh grade students on the MEAP for each elementary school and junior high school within the district;

(8) whether all facilities, such as gymnasiums, auditoriums, cafeterias, are operated in a desegregated manner;

(9) whether extracurricular activities and school events are operated in a desegregated manner;

(10) any plan for new schools or additions to or expansion of existing facilities, with projected enrollment data by race and a statement of how such plan will affect desegregation, including participation in interdistrict desegregated magnet programs;

(11) the sale or discontinued use of any school facility within the three districts, including the revenue received and the allocation of that revenue in the school district budget;

(12) description and evaluation of in-service training provided to staff and students with details as to numbers of participants, the nature and length of programs and workshops;

(13) a summary of activities of each district desegregation representative(s) within each school building since the superintendent's last report.

## FINANCE

The plans submitted to the court during the remedy hearing have avoided recommendations to the court on the difficult and complex problems of financing of this remedy plan. Dr. Stolee has recommended a plan for financing development of magnet programs, interdistrict transfers, transportation, in-service training, and costs involved in improving the educational quality of schools operated in the Benton Harbor system. In several of these areas, the court has followed his recommendations.

Federal funding of programs outlined in this plan should be sought to the maximum feasible levels by the three local school districts, the intermediate school district, and the state acting cooperatively.

In addition, magnet programs should be financed in part by the existing operating budgets of the three local districts and supplemented by additional financial contributions from the state and intermediate district. Consultant assistance for development and initial implementation of distinctive magnet programs should not exceed $50,000 per year for the period from the date of this court's order to the end of the 1981–82 school year, and for the 1982–83 school year. These consultant expenses shall be paid by the defendants as follows: the State of Michigan, 60%; the Benton Harbor School District, 15%; the Intermediate School District, 10%; the Coloma School District, 10%; and the Eau Claire School District, 5%. Each local school district shall assume the costs of continuing administrative and teaching staff through the summer of 1981, to the extent reasonably necessary for planning of magnet programs and in-service programs to be put in place in the 1981–82 school year.

No school district shall be penalized financially or lose any state financial aid as a result of a student or parent's decision that a student will take advantage of interdistrict educational opportunities under this court's plan. If districts stand to loose financial resources when students transfer, their motivation to encourage their own

students to participate in these programs will undoubtedly be diminished. Additional resources generated above and beyond regular district operating budgets under the financial plan set forth in the paragraph below shall be used by the districts acting cooperatively to finance enriched educational opportunities and magnet programs, in each district, for the benefit of children in all three districts.

The State of Michigan shall assume 100% of the following costs. For each student who elects to attend school in one of these three districts, other than his or her district of residence, the state shall continue to pay to the school district of residence, the amount of state financial aid that the student would have generated had he or she not elected to transfer. For each pupil transferring to another district under this plan, either by participating in a magnet program or by election of an interdistrict transfer, the state shall pay the receiving school district 100% of the costs involved in educating that pupil. Education costs under this provision shall be computed as an amount equal to the receiving school district's annual maintenance costs per regularly enrolled student.

In order for these interdistrict programs to be effective, transportation for voluntary transfers under the magnet program and interdistrict transfer component must be provided at no cost to the transferring student. *See, Swann, supra,* 402 U.S. at 26–27, 91 S.Ct. at 1281–1282; and *Keyes, supra,* 413 U.S. at 240–241, 93 S.Ct. at 2713–2714 (opinion of Powell, J.). Transportation costs for travel to and from school for each transferring pupil shall be provided by the school district of the child's residence. The state shall reimburse the local school district for these transportation costs according to a funding formula used for transportation of other students entitled to school transportation at public expense. Reimbursement shall cover capital outlay and continuing operating expenses connected with interdistrict transfers. Every effort should be made to coordinate school openings and closings of the three districts so that existing buses will be used to their maximum effectiveness in the interdistrict components of the plan. The court-appointed transportation expert will be available to assist in development of cost efficient transportation schedules.

Costs necessary for development and implementation of the social skills and achievement components of the plan will be paid by the State of Michigan according to a formula originally developed by the legislature and used to determine the allocation to each district eligible to participate in the Article 3 program, designed to enable school districts to conduct educational programs to improve basic cognitive skills.[28]

This formula is based on 1980 achievement scores of students in the fourth and seventh grades in the Benton Harbor district. The statutory formula has been modified to include a budget adequate to cover the Benton Harbor junior high schools and the senior high school. This formula is used by the court only for the purpose of calculating an adequate budget to conduct the programs under the achievement component of the court's plan. It should not be used by the district to identify low achieving students or to stigmatize students in any way.

State financial contributions to this component of the plan, for the next three school years, shall be based on the estimated number of students in the Benton Harbor schools in grades K through 6 and grades 7 through 12, who are in need of achievement motivation and basic cognitive skill development. The number of these students in the district will be estimated based on a formula which uses the percentage of students in grade 4 and grade 7 who attained 40% or fewer achievement objectives on the statewide achievement tests in the preceding school year.

28. "Article 3" is a state-funded program under the State School Aid Act of 1979, under which money is appropriated and allocated to school districts for educational programs designed to improve achievement in basic cognitive skills. The provisions of that article are codified at M.C.L.A. § 388.1631 *et seq.*

Using the reading and mathematic scores on state-wide achievement tests given in the Fall of 1980, the percentage of the district's pupils in grade 4 who attained 40% or fewer of the reading objectives and the percentage who attained 40% or fewer of the mathematics objectives shall be averaged. The aggregate enrollment of the district in grades K through 6 on the official membership count date in September of 1980 shall be multiplied by this average percentage to determine the estimated number of students in grades K through 6 in need of assistance in developing basic achievement motivation and cognitive skill improvement under this component of the plan.

A similar formula shall be applied to determine the estimated number of students in grades 7 through 12 with similar developmental and achievement needs. Using the reading and mathematic test scores on state-wide achievement tests given in the Fall of 1980, the percentage of the district's students in grade 7 who attained 40% or fewer of the reading objectives and the percentage who attained 40% or fewer of the mathematics objections shall be averaged. The aggregate enrollment of the district in grades 7 through 12 on the official membership count date in September of 1980 shall be multiplied by this average percentage to determine the estimated number of students in grades 7 through 12 in need of assistance in basic achievement motivation and cognitive skill improvement under this component of the plan.

An estimated total number of students in grades K through 12, who are in need of achievement motivation and cognitive skill improvement, shall be calculated using this formula. The State of Michigan shall, as part of its participation in this remedy plan, pay to the Benton Harbor School District an amount equal to $200 per pupil. This money will be used by the school district exclusively to implement the achievement component of the court's plan. This budget figure represents the total amount of the budget for the achievement component of the plan for each of the next three school years.

Funds distributed to the district by the state under this formula shall be used to conduct an initial evaluation of the school district, to pay fees and expenses of the court appointed consultant, salaries of professional staff, psychiatric or psychological consultants hired under the achievement component, educational materials used in that component, and finally periodic evaluation of the component. This money will be allocated to the school district in addition to any money that it is entitled to under Article 3 of the State School Aid Act, M.C.L.A. § 388.1631 *et seq.* The school district's allocation under that section shall not be diminished in any way as a result of money paid under this court's order for implementation of the achievement component of the plan.

After three school years, and for each school year thereafter in which the component continues, the budget for the achievement component will be readjusted applying the same formula using achievement data and enrollment statistics for the immediately proceeding school year. If the district shows evidence of having attained the achievement goals, in the schools within its boundaries, as established by the court in this opinion, the program will be continued, but progressively phased out, over two additional years. In the school year immediately following the year in which achievement goals are attained, funds for this component shall be distributed to the district in an amount equal to 50% of the amount received under this formula in the preceding school year. In the final year of operation of this component, the funds distributed will be in an amount equal to 25% of the amount received in the base school year.

The cost of conducting the in-service and human relations training program for employees and students of the three local school districts shall be paid by the State of Michigan. Payment may be satisfied by the state through a combination of contribution of services by qualified personnel from the State Department of Education and direct payment jointly to the three school districts. The school districts jointly

shall spend and the state shall subsidize an amount equal to $100 per employee of the three local school districts, for the period from the date of this court's order through the end of the 1981–82 school year. Costs for the succeeding 1982–83 and 1983–84 school years should be in an amount equal to $20 per employee in these three local districts. These costs to the state shall represent actual money allocated and credited shares of the salary of any professionals already on the state payroll, who are actively involved in conducting in-service under the court's plan. The amount of the salary of any professional used in this capacity shall be credited in an amount representing the proportion of their annual salary equal to the proportion of their time spent on in-service training within the three school districts.

Contribution of services and money paid by the State of Michigan and the Intermediate School District for purposes of implementing this plan shall be paid in addition to usual program and financial aid assistance paid to these three local districts.

A teacher who is reassigned to another school district for purposes of facilitating adjustment to interdistrict aspects of this plan and contributing to affirmative action goals shall remain an employee of the home school district, on temporary reassignment. Each reassigned teacher will continue to have his or her regular salary paid by his or her home school district. Provided there is a one-on-one teacher exchange between the Benton Harbor district and the Coloma district or the Benton Harbor district and the Eau Claire district, there will be no reimbursement from the district receiving the teacher's services. If, however, a black, Benton Harbor teacher is reassigned to the Coloma or Eau Claire district and no teacher from the receiving district is reassigned to the Benton Harbor district, the receiving district shall reimburse the home school district for the salary and benefits of the reassigned teacher. The home school district will continue to pay the teacher's salary and will bill the district receiving the teacher's services. The salary of any reassigned teacher shall continue to be commensurate with the salary he or she would have received in the home school district. These teachers shall be paid each year an additional $1,000 as an incentive salary to encourage voluntary and cooperative election for a two-year reassignment to another school district. This incentive salary shall be paid by the school district responsible for paying the teacher's salary. The State of Michigan shall reimburse the district in quarterly increments throughout the school year for any amounts paid as teacher incentive salaries.

Under the court's recommended reassignment plan, for desegregation of the Benton Harbor schools, transportation for purposes of achieving complete desegregation should be accomplished without additional purchase of buses by the school district. Should, however, the school district find that the existing bus fleet is not adequate to accomplish transportation under a desegregation plan, and that purchase of additional buses is necessary, the court will issue supplementary orders dealing with the financial responsibility of the defendants for transportation costs.

## CONCLUSION

In formulating a desegregation remedy, the court has tried very hard to consider the interests and concerns of all persons and organizations who will be affected by the plan. Over the past several months, I have received and read a great volume of correspondence from individuals representing all points of view. Hopefully, a careful reading of the plan itself will reflect that my primary concern has been to devise a constitutionally-acceptable plan which will be in the best interests of the students themselves.

The extent to which it will succeed in desegregating the public schools and improving the quality of education within those schools remains to be seen. One thing, however, is crystal clear: the quality education of a generation of students is at stake. It is the students in the schools who

will be directly and permanently affected by the way the citizens of Benton Harbor, Coloma, and Eau Claire, as well as the Intermediate School District, the State Board of Education, the State Superintendent of Education, the Attorney General, the Governor, and the State of Michigan carry out the plan.

## APPENDIX A

### PREPARATION FOR DESEGREGATION: SCHOOL BOARD, STAFF, PARENTS AND STUDENTS

In the process of changing schools, children are subjected to physical, emotional and psychological stresses. Adequate preparation for students, faculty and parents will increase the likelihood that these transitions will be effective and not troublesome for each child involved. It has been demonstrated that the only way desegregation will work is through understanding and cooperation of all persons involved in the transition to desegregated schools. Consequently, the court has outlined below an agenda for the explanation of the court's plan to all school board members, administrators, faculty, support staff, students and parents. In addition, this appendix includes a brief overview of significant dates and deadlines established by the court in the accompanying opinion. The administration and staff in each of these three local school districts should take all steps necessary and make every effort to accomplish the tasks outlined below on or before the date indicated by the court.

### Overview of Significant Dates and Deadlines

| Date/Deadline | Event | Resource |
|---|---|---|
| April 28, 1981 | Notice of joint school board meeting to members of the school boards of the three local districts and the Intermediate School Board. | Each school district and the Berrien Co. Intermediate School District. |
| May 1, 1981 | Target date for district court opinion on remedy plan. | Judge Hillman |
| May 5, 1981 | Joint meetings of Benton Harbor, Coloma and Eau Claire School Boards and Intermediate School Board. | Dr. Stolee |
| May 12 | Completion of Benton Harbor pupil reassignment plan and transportation plan | Dr. Hawkins, staff members and Dr. Stolee |
| May 15 | Target date for completion of video or slide show explanation of desegregation plan. | Dr. Stolee |
| May 18 thru June 10 | In-service for Benton Harbor, Coloma, Eau Claire: faculty, students, and parents. | Dr. Stolee and in-service team |
| May 1981 | Establish and convene Community Education Council. | Judge Hillman |
| June 1, 1981 | Dr. Comer visit to the Benton Harbor School District, to become familiar with the district and discuss the achievement component of the plan. | Dr. Comer |
| July 1, 1981 | Completion of magnet programs planned for the fall of 1981-82 school year. | Magnet program committee |
| July 15, 1981 | School Board complete review and comment of magnet programs plan and literature. | School Board |
| July 31, 1981 | Information to parents and students explaining magnet programs and interdistrict transfers, including literature on exercise of choice for participation in interdistrict transfers. | Magnet program committee |
| August 1-20, 1981 | Open period for student/parent election of choice to participate in interdistrict magnet programs and transfers. | |
| August 25, 1981 | Report to the court on student election to participate in magnet programs and interdistrict transfers. | Dr. Hawkins, Dr. Barrett, Dr. Horie |
| One week before school begins in 1981-82 school year | Intensive workshops for Benton Harbor, Coloma and Eau Claire faculty in preparation for three district transfers and desegregation. | In-service team |
| Three days before school opens | Intensive in-service orientations and workshops for students in Benton Harbor, Coloma and Eau Claire | In-service team, principals, faculty |
| September 20, 1981 | Report from each superintendent on teacher hiring, reassignment and affirmative action goals. | Dr. Hawkins, Dr. Barrett, Dr. Horie |
| September-October, 1981 | Evaluation of Benton Harbor school system to identify obstacles to effective learning and achievement. | Dr. Comer, evaluation team |
| October 15, 1981 | Coloma and Eau Claire School Districts report on curriculum and textbook racial bias evaluation. | Dr. Barrett, Dr. Horie |

| Date/Deadline | Event | Resource |
|---|---|---|
| November 1, 1981 | Report to the court on recommendations of interventions to improve achievement in Benton Harbor school system. | Dr. Comer |
| November 30, 1981 | Report from school conduct and discipline committee on uniform code. | Conduct and Discipline Committee |
| January, 1982 | Begin implementation of achievement component of plan in Benton Harbor school system. | Dr. Comer |
| January 15, 1982 | Semi-annual report to the court from the Community Education Council | Community Education Council |
| June 30, 1982 | Annual desegregation progress report from Superintendents. | Dr. Hawkins, Dr. Barrett, Dr. Horie |
| June 30, 1982 | Semi-annual report to the court from the Community Education Council | Community Education Council |

## SCHOOL BOARDS

| Date/Deadline | Event | Resource |
|---|---|---|
| April 28, 1981 | Notice of joint meeting of three district school boards and the Intermediate School Board to be held Tuesday, May 5, 1981. | School Districts |
| May 5, 1981 | Joint meeting of three district school boards and Intermediate School Board: (1) explanation of the plan; (2) a clear explanation of school board members' responsibilities in the desegregation process; (3) establish deadlines for tasks ordered under the court's plan, i.e., hiring of in-service committee, appointment of magnet program committee, naming of representatives to the Conduct and Discipline Committee. (4) discussion of agenda for future explanation of the plan; (5) discussion of agenda for intensive faculty workshops to be held June 9, 10 and 11 | Dr. Stolee |
| May, 1981 | Possible additional joint meeting of three district school boards: (1) introduction of court established Community Education Council; (2) viewing of video or slide show explanation of plan; (3) additional in-service (a) problems related to desegregation (b) need for effective leadership | Judge Hillman, Dr. Stolee, In-service team |

## ADMINISTRATION/PRINCIPALS

| Date/Deadline | Event | Resource |
|---|---|---|
| May 5, 1981 | Superintendent council meeting with court representative to explain plan and role of superintendents in implementation of the desegregation plan. | Dr. Stolee |
| May 19, 1981 | Administration (1) Showing of video or slide show explanation of the plan to Benton Harbor, Coloma and Eau Claire elementary and secondary principals (2) Establish and explain clear lines of communication critical to the plan; (3) Emphasize importance of leadership of principals to effective implementation of the plan; (4) Question and answer period for clarification of the plan; (5) Discussion of agenda for future explanation of plan; (6) Discussion of agenda for intensive faculty workshops to be held June 9, 10 and 11 (7) Divide into elementary, secondary principal groups for afternoon in-service training (a) leadership role (b) attitude assessment (c) importance of parental participation to effective learning (d) principal as agent of change and adaptation for: staff, students, parents, community | Dr. Stolee, In-Service team |
| May 19, 1981 | Benton Harbor Principals (1) Presentation of details related to each principal's school should follow orientation of total plan (2) Elementary principals: establish Principal Cluster Councils (3) Identify a desegregation representative in each school building | In-service team |

| Date/Deadline | Event | Resource |
|---|---|---|
| May 28, 1981 (afternoon) | Benton Harbor Elementary Principals: Cluster principal meetings<br>   Preparation for intensive faculty workshops to be held June 9, 10 and 11 | In-service team |
| May 28, 1981 | Coloma and Eau Claire Principals: Same purpose | In-service team |
| June 1, 1981 | Benton Harbor Principals: Possible joint meeting with Dr. Comer; explanation of achievement component of the plan and discussion of work accomplished by Dr. Comer in New Haven, Connecticut. | In-service team |
| June 4, 1981 | Benton Harbor, Coloma and Eau Claire Junior High School and Senior High School Principals Meeting: preparation for faculty intensive workshops to be held on June 9, 10 and 11 | In-service team |
| June 11, 1981(afternoon) | Principal meetings, including Benton Harbor Principal Cluster Councils, Junior and Senior High School principals and Coloma and Eau Claire principal meetings; evaluation of intensive faculty workshops held on June 9, 10 and 11. | In-service team |

## FACULTY: BENTON HARBOR, COLOMA AND EAU CLAIRE

| | | |
|---|---|---|
| May 20, 1981 | **Benton Harbor Faculty**<br>(1) viewing of video or slide show explanation of plan;<br>(2) orientation to plan;<br>(3) question and answer period for clarification of plan;<br>(4) establish Benton Harbor elementary faculty cluster groups, explain agenda for future meetings;<br>(5) explanation of future agenda for explanation and discussion of the plan with students and parents;<br>(6) discussion of teachers' role in explanation of the plan to students and explanation of agenda for future faculty intensive work-shops to be held June 9, 10 and 11<br>(7) afternoon of in-service orientation to desegregation problems and special challenges to teachers in desegregated schools. | Dr. Stolee, In-service team |
| May 21, 1981 | **Coloma Faculty**<br>(1) viewing of video or slide show explanation of plan;<br>(2) orientation to plan;<br>(3) question and answer period for clarification of plan;<br>(4) explanation of future agenda for discussion of plan;<br>(5) discussion of teachers' role in explanation of plan to students and explanation of agenda for future faculty intensive workshops to be held June 9, 10 and 11 and special in-service for Coloma on June 2<br>(6) afternoon in-service for Coloma faculty. | Dr. Stolee, In-service team |
| May 22, 1981 | **Eau Claire Faculty**<br>(1) viewing of video or slide show explanation of plan, agenda same as above for Coloma faculty including additional special in-service day for Eau Claire faculty on June 3 | Dr. Stolee, In-service |
| May 25, 1981 | Benton Harbor teachers: participation in explanation of plan to Benton Harbor students. | |
| May 26, 1981 | Coloma teachers: participation in explanation of plan to Coloma students. | |
| May 27, 1981 | Eau Claire teachers: participation in explanation of plan to Eau Claire students | |
| May 28, 1981 | Benton Harbor elementary teachers cluster faculty council meeting by grade level. | Benton Harbor Elementary Teachers |
| June 1, 2 & 3, 1981 | Benton Harbor Elementary, Junior High School Students: school visitation, establish buddy system for students transferring to new schools. | Benton Harbor School District |
| June 1, 1981 | Benton Harbor faculty: possible meeting with Dr. Comer to discuss aspects of achievement component of plan. | Dr. Comer |

| Date/Deadline | Event | Resource |
|---|---|---|
| June 2, 1981 | Coloma: in-service for faculty | In-service team |
| June 3, 1981 | Eau Claire: in-service for faculty | In-service team |
| June 4, 1981 | Benton Harbor cluster faculty council meetings and school visitations for teachers to become familiar with schools within their cluster area. | Benton Harbor Elementary Faculty |
| June 8, 1981 | Last day of school in Benton Harbor | |
| June 9, 10 & 11, 1981 | Benton Harbor, Coloma, Eau Claire: intensive faculty workshops. | In-service team |
| June 9, 10 & 11, 1981 | Intensive workshops for guidance counsellors, social workers and psychologists in all three districts. | In-service team |
| June 11, 1981(afternoon) | Cluster faculty council/grade level meetings for evaluation of workshops, Benton Harbor Junior, Senior High faculty (same); Coloma Elementary/Junior, Senior High faculty (same). | In-service team |
| June 11, 1981(afternoon) | Staff guidance counsellor, social worker, psychologist: joint evaluation of workshops | In-service team |

### STUDENTS AND PARENTS

| | | |
|---|---|---|
| May 25, 1981 | Elementary parents: viewing of video or slide show explanation of plan, orientation to the plan and question and answer period followed by explanation of plan to elementary students, orientation and question and answer period. | In-service team |
| (Afternoon) | Junior and senior high school students and parents: viewing of video or slide show explanation of plan, orientation to the plan, question and answer period. | In-service team |
| 7-9:00 p.m. | Benton Harbor parents and interested community members: public viewing of the explanation of the plan, question and answer period, clarification of the plan, focus on importance of parental participation to effectiveness of the plan and effective learning. | Dr. Stolee and In-service team |
| May 26, 1981 | Coloma students: orientation to the court's plan similar to that conducted for Benton Harbor students | In-service team |
| (morning) | Elementary students and parents | |
| (Afternoon) | Junior and senior high school students and parents | |
| (Evening) 7:00 p.m. | Public meeting for parents and interested community members | |
| May 27, 1981 | Eau Claire students: viewing of video or slide show explanation of the court's plan and orientation to that plan. | In-service team |
| (Morning) | Elementary students and parents | |
| (Afternoon) | Junior, senior high school students and parents | |
| (Evening) - 7:00 p.m. | Public viewing for parents and interested community members | |
| June 1, 2 & 3, 1981 | Benton Harbor elementary, junior high school students:<br>(1) school visitation, opportunity to become familiar with the school students will be attending in 1981-82 school year;<br>(2) establish buddy system for students transferring to new schools. | In-service team |
| June 8, 1981 | Last day of school in Benton Harbor | |
| July 31, 1981 | Notice to parents and students of the content of magent programs and information on inter-district transfer opportunities. | Magnet Programs Committee |
| August 20, 1981 | Deadline for selection of choice of magnet programs or interdistrict transfer | Parents/students |

| Date/Deadline | Event | Resource |
|---|---|---|
| Summer, 1981 | Opportunity for summer student leadership workshop (1) develop student leadership skills; (2) emphasize the importance of the role of student leaders in accepting the desegregation program and adopting to the program; (3) the role of students in encouraging parental participation in school activities and operations | In-service team |
| September, 1981 (Before opening day of school) | Orientation of students to desegregation and to new schools they will be attending; three in-service days for students in all three district, minimally two, 4-1/2 hour days (1) establish buddy system for students transferring to magnet programs or exercising option for interdistrict transfer; (2) include special workshops for student leaders. | Benton Harbor, Coloma and Eau Claire students and In-service team |
| September, 1981 (Before opening day of school) | Orientation for parents of students partici- ing in magnet programs and interdistrict transfers; establish buddy system for parents of interdistrict transfer students, if possible. | Dr. Stolee, In-service team |

## PUBLIC/COMMUNITY

| | | |
|---|---|---|
| | A video or slide show explanation of the plan will be made available to community groups in Benton Harbor, Coloma and Eau Claire, preferrably with the benefit of some resource person(s), one or more of the desegregation representatives from each school district, and/or a member of the court established Community Education Council. This video or slide show presentation will be available through the Berrien County Intermediate School Media Center. | School district desegregation repre- sentatives and CEC members |

APPENDIX B

BERRIEN CO.
ELEMENTARY PAIRS & CLUSTERS

Morton/Northshore/Lafayette

Johnson/McCord

Bard/Hull

Boynton/Pearl

Sorter/Brunson/East

King/Britain/West
Northwest

Northeast

Stump

## APPENDIX C

BERRIE CO.

JUNIOR HIGH FEEDER PATTERN

Benton Harbor Jr. High

Fairplain Jr. High

## APPENDIX D

In the Foster/Green plan, it is recommended that inservice training be conducted with the following goals in mind:

(1) To promote interracial cooperation and understanding among students, teachers, administrators, and all support staff in order to prevent minor concerns and irritations from developing into major conflict situations.

(2) To assist support staff in their understanding of the uniqueness of all students, and to develop skills which will enable them to deal effectively with conflict situations specifically related to racial desegregation.

(3) To help professional staff develop skills which prevent social and academic resegregation from occurring.

(4) To assist the total staff in understanding the impact of school desegregation on all students.

(5) To increase the level of sensitivity to minorities.

(6) To develop an awareness of personal and institutional racism, and to eradicate its effects within the desegregation area.

(7) To develop the capacity to understand and accept racial and cultural diversity.